### McCABE et al. v. ATCHISON, T. & S. F. RY. CO. et al.

(Circuit Court of Appeals, Eighth Circuit. February 10, 1911.)

No. 3,054.

1. STATES (§ 9*)—FORMATION—ENABLING ACTS—CONSTRUCTION.

The authority conferred by the act (Act June 16, 1906, c. 3335, 34 Stat. 267) enabling the people of Oklahoma and Indian Territory to form a constitution, which provides that the delegates to the constitutional convention shall adopt the federal Constitution, and shall form a state constitution which shall be republican in form, and which shall make no distinction in civil and political rights on account of race or color, and which shall not be repugnant to the federal Constitution, is a working rule, addressed to the delegates forming a constitutional convention, and, where a constitution formed by the convention has been declared by the President of the United States as authorized by the enabling act to conform to the enabling act, the obligations of the character indicated imposed by the enabling act cease, and individuals may not invoke the act as a prohibition against state legislation, though the enabling act also requires that the constitutional convention shall accept its terms and adopt an ordinance to that effect.

[Ed. Note.—For other cases, see States, Cent. Dig. § 4; Dec. Dig. § 9.*]

2. CONSTITUTIONAL LAW (§§ 206, 218*)—EQUAL PROTECTION OF THE LAWS.

The provision of Comp. Laws Okl. 1909, § 434 et seq., requiring every railway company doing business in the state to provide separate coaches for the accommodation of the white and negro races, equal in points of comfort and convenience, and to maintain separate waiting rooms at their passenger depots for the accommodation of the races, does not abridge the privileges and immunities of the negro race, and deny to them the equal protection of the laws, in violation of the fourteenth amendment to the federal Constitution.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 625–648, 715; Dec. Dig. §§ 206, 218.*]

3. CONSTITUTIONAL LAW (§ 218*)—EQUAL PROTECTION OF THE LAWS.

The proviso in the statute that nothing contained therein shall be construed to prevent railway companies in the state from hauling sleeping cars, dining, or chair cars attached to their trains to be used exclusively by either white or negro passengers separately, imposes no obligation on carriers to haul such cars for either race, but permits them to haul such cars for the separate use of either of the races, and it is not discriminatory against either race, and does not deprive the negro race of the equal protection of the laws.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 715; Dec. Dig. § 218.*]

4. CONSTITUTIONAL LAW (§ 218*)—EQUAL PROTECTION OF THE LAWS.

Equality of service does not mean identity of service. It is only when conditions and circumstances are substantially alike, and when demand

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

for luxuries like sleeping cars, dining cars, and chair cars is of a substantial character, that they must be furnished for one race, if furnished for the other.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 715; Dec. Dig. § 218.*]

5. CONSTITUTIONAL LAW (§ 218*)—EQUAL PROTECTION OF THE LAWS.

That carriers operating under Comp. Laws Okl. 1909, § 434 et seq., requiring carriers to provide separate coaches for the accommodation of the white and negro races, equal in all points of comfort and convenience, operate unevenly and oppressively to the negro race by their interpretation and execution of the statute, does not render the statute violative of the fourteenth amendment to the federal Constitution, as depriving the negro race of the equal protection of the laws.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 715; Dec. Dig. § 218.*]

6. CONSTITUTIONAL LAW (§ 48*)—COMMERCE CLAUSE—CONSTRUCTION IN FAVOR OF CONSTITUTIONALITY.

Comp. Laws Okl. 1909, § 434 et seq., requiring every railway company doing business in the state to provide separate coaches for the accommodation of the white and negro races, equal in all points of comfort and convenience, must be construed to apply to intrastate commerce alone, and, when so construed, it is not violative of the commerce clause of the federal Constitution.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 46; Dec. Dig. § 48.*]

7. INJUNCTION (§ 195*)—INCIDENTAL RELIEF—BILL—SUFFICIENCY.

The allegations of a bill in a suit to enjoin railroads from obeying Comp. Laws Okl. 1909, § 434 et seq., requiring every railway company to provide separate coaches for the accommodation of the white and negro races, brought before the statute became operative, that the railroads are making distinctions in the civil rights of the negro race and persons of the white race in the operation of its trains, in that equal comforts and accommodations will not be provided for the negro race, that passenger coaches maintained for the negro race are not provided with separate and equal toilet and waiting rooms for male and female passengers of the negro race, nor equal smoking accommodations, nor separate and equal chair cars, sleeping cars, and dining car accommodations, are too vague to constitute a cause of action, and, where the court denies the injunctive relief sought, it may not award damages as incidental legal relief.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. § 415; Dec. Dig. § 195.*]

Sanborn, Circuit Judge, dissenting.

Appeal from the Circuit Court of the United States for the Western District of Oklahoma.

Suit by E. P. McCabe and others against the Atchison, Topeka & Santa Fé Railway Company and others. From a decree of dismissal rendered after sustaining a demurrer to the bill, complainants appeal. Affirmed.

E. O. Tyler, E. T. Barbour, and William Harrison, for appellants.

S. T. Bledsoe (J. R. Cottingham, C. O. Blake, Clifford L. Jackson, R. A. Kleinschmidt, and C. E. Warner, on the brief), for appellees.

Before SANBORN, HOOK, and ADAMS, Circuit Judges.

ADAMS, Circuit Judge. This case turns upon the validity or true construction of an act of the Legislature of Oklahoma, approved De-

cember 18, 1907 (Comp. Laws Okl. 1909, p. 271, c. 9, art. 2, § 434 et seq.), requiring every railroad company doing business in that state as a common carrier of passengers to provide separate coaches or compartments for the accommodation of the white and negro races, equal in all points of comfort and convenience, and to maintain separate waiting rooms at all their passenger depots for the accommodation of those races also equal in all points of comfort and convenience.

The complainants, five negro citizens of Oklahoma, instituted this suit against the defendants, several railway companies doing business throughout Oklahoma in state and interstate commerce, to enjoin them from obeying this law, on the grounds (1) that it violates the provisions of the act enabling the people of Oklahoma and the Indian Territory to form a constitution and be admitted into the Union, approved June 16, 1906 (part 1, 34 Stat. 267), in this: that it makes a distinction between the civil rights of the negro and white race of men, contrary to the condition imposed by section 25 of that act; (2) that it is in conflict with the fourteenth amendment to the Constitution of the United States, in that it abridges the privileges and immunities of citizens and deprives them of the equal protection of the laws; (3) that it violates the provisions of the commerce clause of the Constitution, in that it is an attempt to regulate commerce among the several states; and (4) that the several defendants are not in fact conforming to the requirements of the law by furnishing cars and waiting rooms for the negro race equal in point of comfort and convenience to those furnished for the white race. The learned trial judge sustained a demurrer to the bill, and, upon complainants declining to plead further, dismissed it. From this an appeal followed.

[1] It is very clear, we think, that complainants cannot invoke the enabling act as in itself a prohibition against the legislation in question. The first paragraph of section 3 of that act reads as follows:

"That the delegates to the convention thus elected shall meet at the seat of government of said Oklahoma Territory, * * * and, after organization, shall declare on behalf of the people of said proposed state that they adopt the Constitution of the United States; whereupon the said convention shall, and is hereby authorized to form a constitution and state government for said proposed state. The Constitution shall be republican in form, and make no distinction in civil and political rights on account of race or color, and shall not be repugnant to the Constitution of the United States and the principles of the Declaration of Independence."

The authority conferred by this section with its limitations and prohibitions was most obviously addressed to the delegates chosen under the provisions of section 2 of the act, when they should have assembled in convention for the purpose of forming a constitution and state government. A constitution which should make no distinction in civil or political rights on account of race or color was the only kind of a constitution the delegates were empowered to make. When it should be made and the provisions of the enabling act found to have been "complied with in the formation thereof" by the President, who was the arbiter constituted for that purpose by the fourth section of the act, the state became a member of the federal Union "on an equal footing with the original states." The working obligation or instructions imposed by the enabling act in the respect now under considera-

tion upon the delegates chosen to make the Constitution ceased to have force or effect when that instrument was made and found and proclaimed by the constituted umpire to be in accordance with the act which authorized it. Permoli v. First Municipality, 3 How. 589, 609, 11 L. Ed. 739; Escanaba Co. v. Chicago, 107 U. S. 678, 688, 2 Sup. Ct. 185, 27 L. Ed. 442; Willamette Iron Bridge Co. v. Hatch, 125 U. S. 1, 8 Sup. Ct. 811, 31 L. Ed. 629; Ward v. Race Horse, 163 U. S. 504, 16 Sup. Ct. 1076, 41 L. Ed. 244; Bolln v. Nebraska, 176 U. S. 83, 20 Sup. Ct. 287, 44 L. Ed. 382; United States ex rel. v. United States Express Co. (D. C.) 180 Fed. 1006.

The requirement of section 22 of the enabling act that the constitutional convention should accept the terms and provisions of that act and adopt an ordinance to that effect, to which our attention is specially directed by counsel for complainants, affords no additional warrant for their contention. The provisions which called the convention into being and fixed boundaries and limitations upon its powers were not enlarged by the adoption of that ordinance; neither were they diverted from their object and purpose as plainly expressed. Whatever effect the acceptance of the terms and provisions of the enabling act may have upon other questions to which they might be applicable, we are clearly of opinion it was never intended by the language employed to transfer the limitation upon the powers of the convention itself to the state Legislature after statehood should have been accomplished.

Therefore, even if the Oklahoma statute in some of its provisions made a distinction in civil rights on account of race or color contrary to the instructions of the enabling act (which, however, is not admitted), no cause of action could be predicated upon that act itself, and no relief could be granted unless the distinction (or discrimination as it was called in argument) violated some of the prohibitions of the federal Constitution, which after statehood became the exclusive federal chart of complainants' civil and political rights.

[2] The argument is next made that the statute in question violates the fourteenth amendment to the Constitution of the United States, in that the enforced separation of the negro race from the white race in railroad cars and waiting rooms abridges the privileges and immunities of the former, and denies to it the equal protection of the laws. This question in our opinion is not an open one. The Supreme Court of the United States in Plessy v. Ferguson, 163 U. S. 537, 16 Sup. Ct. 1138, 41 L. Ed. 256, has foreclosed further discussion. Mr. Justice Brown, speaking for that court, made these observations:

"The object of the amendment was undoubtedly to enforce the absolute equality of the two races before the law, but in the nature of things it could not have been intended to abolish distinctions based upon color, or to enforce social, as distinguished from political equality, or a commingling of the two races upon terms unsatisfactory to either. Laws permitting, and even requiring, their separation in places where they are liable to be brought into contact, do not necessarily imply the inferiority of either race to the other, and have been generally, if not universally, recognized as within the competency of the state Legislatures in the exercise of their police power. * * * So far, then, as a conflict with the fourteenth amendment is concerned, the

case reduces itself· to the question whether the statute of Louisiana [similar to that here involved] is a reasonable regulation, and with respect to this there must necessarily be a large discretion on the part of the Legislature. In determining the question of reasonableness, it is at liberty to act with reference to the established usages, customs, and traditions of the people, and with a view to the promotion of their comfort, and the preservation of the public peace and good order. Gauged by this standard, we cannot say that a law which authorizes or even requires the separation of the two races in public conveyances is unreasonable, or more obnoxious to the fourteenth amendment than the acts of Congress requiring separate schools for colored children in the District of Columbia, the constitutionality of which does not seem to have been questioned, or the corresponding acts of state Legislatures."

In view of this decision further discussion of the general question is neither necessary nor seemly on our part.

[3] But there is one special feature of the Oklahoma statute which counsel for the complainants contend is in itself discriminatory and operates to deprive the negro race of the equal protection of the laws within the meaning of the Constitution. This is found in the proviso to section 7, which reads as follows:

· "Provided that nothing herein contained shall be construed to prevent railway companies in this state from hauling sleeping cars, dining or chair cars attached to their trains to be used exclusively by either white or negro passengers, separately, but not jointly." Laws 1907–08, c. 15.

In our opinion· this contention is not sound. Other parts of the statute make ample provision for the actual transportation of both races in reasonable comfort and convenience. Separate coaches or compartments equal in all points of comfort and convenience must, under severe penalties, be carried on each trip by every train moving within the state. Sections 1 and 5. Sleeping cars, dining cars, and chair cars are, comparatively speaking, luxuries, and properly enough no such imperative provisions are made concerning them as are made concerning the common and indispensable coach or compartment. The proviso imposes no obligation upon carriers to haul such cars for either race, but out of abundant caution lest the former provisions of the act, the keynote of which is equality of service between the races, should be construed to require the carriers ·to constantly haul separate sleeping, dining, and chair cars for them, it is provided that they might haul them for the separate but not joint use of either of the races. This provision in itself makes no more discrimination against one race than the other. The Legislature having in mind doubtless, what we judicially know, that the ability of the two races to indulge in luxuries, comforts, and conveniences was so dissimilar that sleeping and dining cars which would be well patronized by one race might be very little if at all by the other, legislated accordingly, and made a provision by which carriers might supply them for the exclusive use of either race as circumstances might dictate.

It may be conceded that the general principle of equality of service which pervades the Oklahoma statute and which is also required by the common and interstate commerce law (24 Stat. 379 [U. S. Comp. St. 1901, p. 3154]) must be observed by all carriers. As a general rule, if carriers haul cars of special ·and peculiar convenience for citizens

of one race, they must provide equal service for citizens of the other race. Equality of service, however, does not necessarily mean identity of service; and manifestly this rule does not require permanent provision for equal service, irrespective of the demand for it. No mere question of abstract or theoretical right can require the constant and regular equipment and hauling of substantially empty dining, sleeping, or chair cars for either race. Practical considerations, which are potent in reaching a correct interpretation of any statute, cannot be ignored in applying the principle of equality of service to the two races in Oklahoma. Neither can any such interpretation be given to the statute of that state as would in effect require carriers to render service to either race without compensation. That would deprive them of their property without due process of law.

We conclude, in view of these and other like considerations, that the principle of equality of service between the two races in Oklahoma contemplates substantial similarity of service, and this only when conditions and circumstances under which it is required are substantially the same.

[4] But it is contended that the carriers operate under this law unevenly and oppressively to the negro race and by their interpretation and execution of its provisions demonstrate that it is discriminatory. The contention is made on the supposed authority of the case of Yick Wo v. Hopkins, 118 U. S. 356, 6 Sup. Ct. 1064, 30 L. Ed. 220, and cases there cited. That was a case where the public authorities representing the state, against which alone the prohibition of the fourteenth amendment operates, exercised certain arbitrary powers conferred upon them by certain ordinances so as to unjustly discriminate against the Chinese. The Supreme Court held that:

"Whatever may have been the intent of the ordinances as adopted, they are applied by the public authorities charged with their administration, and thus representing the state itself, with a mind so unequal and oppressive as to amount to a practical denial by the state of that equal protection of the laws which is secured to the petitioners, as to all other persons, by the broad and benign provisions of the fourteenth amendment to the Constitution of the United States. Though the law itself be fair on its face and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the Constitution."

This doctrine in our opinion is totally inapplicable to the facts of the present case.

It may well be that the interpretation and application of a law of the state by the properly constituted authorities control its meaning within the purview of the Constitution; but most obviously such interpretation and application of it by private citizens, the defendant carriers in this case, can have no such effect. If it could, lawbreakers might, by their continued violation of a law, convert their own lawlessness into law, and the lawbreaker and not the lawmaker might become its final interpreter.

[5] Is this statute an invasion of the exclusive prerogative of Congress over interstate commerce?

It may be conceded that, if it applies to interstate transportation, it is a regulation of interstate commerce within the meaning of the Constitution. We think this follows from the doctrine laid down by the Supreme Court in Hall v. De Cuir, 95 U. S. 485, 24 L. Ed. 547. In that case a law of Louisiana as interpreted by its highest judicial tribunal required carriers of interstate commerce when operating within the limits of the state to receive colored passengers into cabins set apart for white persons. The court said:

"It [the statute] does not act upon the business through the local instruments to be employed after coming within the state, but directly upon the business as it comes into the state from without or goes out from within."

This, it was held, interfered directly with the freedom of interstate commerce, and therefore encroached upon the exclusive power of Congress. See, also, Louisville, etc., Ry. Co. v. Mississippi, 133 U. S. 587, 590, 10 Sup. Ct. 348, 33 L. Ed. 784, and Chesapeake & Ohio Ry. Co. v. Kentucky, 179 U. S. 388, 391, 21 Sup. Ct. 101, 45 L. Ed. 244.

For like reasons, the Oklahoma law, if, as properly construed, it embraces or relates to interstate commerce at all, would also be a regulation of that commerce. It compels carriers when operating in that state to exclude colored persons from cars or compartments set apart for white persons. The only difference between the Louisiana and the Oklahoma law is that the one compels carriers to receive into and the other to exclude colored persons from cars or compartments carrying white persons. They act alike directly upon the carrier's business as its passenger crosses the state line. Hence, if one is a regulation of interstate commerce, the other must be. The contention, therefore, that the provisions of the Oklahoma statute do not amount to a regulation of interstate commerce, if they concern that commerce at all, is untenable.

The question, then, is whether that statute when properly construed applies to interstate transportation or whether it is limited in its application to that transportation which has its origin and ending within the confines of the state. No provision is found in the act indicating in any express terms that it was intended to apply to interstate commerce. All its provisions concerning the subject of legislation are general.

Thus section 1 provides that *"Every railway company * * * doing business in this state, * * * shall provide separate coaches,"* etc. Sections 2 and 6 make it unlawful *"for any person"* to occupy any waiting room or ride in any coach not designated for the race to which he belongs. While, therefore, the language of the act literally construed is comprehensive enough to include railroads doing interstate business and include passengers while making interstate trips, it neither in express terms nor by any implication other than that involved in the general language employed manifests any intention to invade the exclusive domain of congressional legislation on the subject of interstate commerce.

Local transportation or that which is wholly within the state only,

being within the competency of the state Legislature, would naturally be presumed to have been alone contemplated in the law enacted by it. The constitutional inhibition against a state legislating concerning interstate commerce and the uniform decisions of courts of high and controlling authority emphasizing and enforcing that inhibition, without doubt, were actually as well as constructively known to the members of the Legislature of Oklahoma. It is unreasonable to suppose they intended to legislate upon a subject known by them to be beyond their power and upon which an attempt to legislate might imperil the validity of provisions well within their power. Any other view would imply insubordination and recklessness which cannot be imputed to a sovereign state. This conclusion is supported by abundant authority.

In the case of Louisville, etc., Ry. Co. v. Mississippi, supra, a statute of Mississippi similar to that under consideration requiring all railroads carrying passengers in that state to provide equal but separate accommodations for the white and colored races, and obliging the conductors of passenger trains to assign each passenger to his appropriate car, was under consideration. The case was a writ of error to the Supreme Court of Mississippi which had ruled (Louisville, N. O. & T. Ry. Co. v. State, 66 Miss. 662, 6 South. 203, 5 L. R. A. 132, 14 Am. St. Rep. 599) that the statute, although general and comprehensive in its language, was intended to affect only commerce within the state, and was therefore not in violation of the commerce clause of the Constitution.

The Supreme Court in its decision had regard to the interpretation of the statute by the Supreme Court of Mississippi, and held that commerce wholly within a state was not subject to the constitutional provision, and as a necessary consequence that the law was not an infraction of the commerce clause of the federal Constitution.

In Chesapeake & Ohio Ry. Co. v. Kentucky supra, a statute was under consideration requiring all railroads to furnish separate coaches or compartments of equal convenience and accommodation for its white and colored passengers, empowering conductors to assign each white or colored passenger to his appropriate car or compartment, and authorizing them to decline to carry any passenger who refused to occupy such car or compartment. The language of the statute was, literally speaking, sufficiently comprehensive to include interstate as well as intrastate transportation. In deciding the case the Supreme Court reviewed the Mississippi Case and Plessy v. Ferguson, supra, and also the case of Ohio Val. Ry.'s Receiver v. Lander, decided by the Court of Appeals of Kentucky, 47 S. W. 344, 20 Ky. Law Rep. 913. It quoted liberally from the last-mentioned case upon the authority of which the case then under consideration had been decided by the Kentucky court, to the effect that the Kentucky Legislature did not intend by the general language there employed to embrace transportation of interstate passengers, but only domestic or intrastate passengers. The Supreme Court then said:

"This ruling effectually disposes of the argument that the act must be construed to regulate the travel or transportation on railroads of all white and colored passengers, while they are in the state. * * *"

But the court added:

"Indeed, we are by no means satisfied that the Court of Appeals did not give the correct construction to this statute in limiting its operation to domestic commerce. It is scarcely courteous to impute to a Legislature the enactment of a law which it knew to be unconstitutional, and, if it were well settled that a separate coach law was unconstitutional as applied to interstate commerce, the law applying on its face to all passengers should be limited to such as the Legislature were competent to deal with. * * * While we do not deny the force of the railroad's argument in this connection, we cannot say that the General Assembly would not have enacted this law if it had supposed it applied only to domestic commerce; and, if we were in doubt on that point, we should unhesitatingly defer to the opinion of the Court of Appeals, which held that it would give it that construction if the case called for it."

In the more recent case of Chiles v. Chesapeake & Ohio Ry. Co., 218 U. S. 71, 30 Sup. Ct. 667, 54 L. Ed. 936, decided May 31, 1910, the Supreme Court again considered the contention of a colored person made under the Kentucky statute that he could not be required to occupy a car set apart exclusively for the transportation of persons of his race. It there reviewed its own decisions on the subject which have already been referred to, and refrained from discussing the constitutional restraint upon state Legislatures based upon the distinction between white and colored races, on the ground, as stated in the opinion, that it had been so much discussed in their own cases reviewed and cited "that we are relieved from further enlargement upon it." The judgment of the state court against the contentions of the colored person was affirmed; the court seeming to regard the great question now in controversy as foreclosed.

From the foregoing it appears to us that the decisions of the Supreme Court point to a harmonious and consistent attitude on its part adverse to complainants' present contention, and, while some of the decisions are fortified by local courts' interpretation of statutes, there seems to be a willing acquiescence in the interpretation so placed upon them.

Our own court likewise stands committed to a principle leading inevitably to the same result. In the case of Butler Bros. Shoe Co. v. United States Rubber Co., 84 C. C. A. 167, 156 Fed. 1, we had before us the right of a foreign corporation doing business in Colorado to recover on certain contracts made by it with a domestic corporation. The defense was that the foreign corporation had not qualified to do business in Colorado and had not paid the annual license tax required by all foreign corporations by the Constitution and statutes of that state as a condition for doing business therein. This court, speaking by Sanborn, Circuit Judge, said:

"If the Constitution and statutes of Colorado are to be interpreted to mean, as they clearly read, to prohibit every foreign corporation from exercising any corporate power whatever, or doing any business whatever, in the state, unless they pay the fees and the annual license tax which this legislation requires as a condition thereof, they are unconstitutional and void, so far as they apply to interstate commerce conducted by foreign corporations or suits for and against them in the national courts. There is, however, another view of this case which is both reasonable and persuasive. The law upon the subject which has been considered was the same when the Colorado Constitution was adopted and when her statutes were enacted that it is to-day,

and the legal presumption, in the absence of persuasive evidence of another purpose, is that the people and the Legislature of that state intended in the adoption of this Constitution and the enactment of these laws to obey the supreme law of the land, that they intended to prohibit the doing of intra-state business only * * * without a license from their state. Hence this Constitution and these statutes should be read and interpreted, if possible, in the light of this presumption, so that they will not conflict with the Constitution and the laws of the United States. * * * An interpretation of this legislation so it may conform to the national law, and so that acts done in undoubted violation of its plain terms may be held to be without its true meaning and purpose, is rational and just, and it is supported by high authority."

The Employer's Liability Cases, 207 U. S. 463, 28 Sup. Ct. 141, 52 L. Ed. 297, are thought to be authority against the conclusion reached by us in this case. In those cases it was held that the act of Congress approved June 11, 1906 (34 Stat. 232 [U. S. Comp. St. Supp. 1909, p. 1148]), subjecting any common carrier engaged in trade or commerce in the District of Columbia or in any territory of the United States or between the states to liability to "any of its employés," etc., was unconstitutional. Careful consideration of the opinions, however, has convinced us that the unconstitutionality of the act was not made to rest solely upon the provision creating a liability to "any" employé of a railroad company whether he was engaged in interstate commerce or not. As pointed out by Mr. Justice White, who wrote the opinion of the majority, the act of Congress had relation not only to railroads doing transportation business between the states, but to those engaged in that business within the District of Columbia and within any of the territories of the United States over which Congress had plenary legislative power. It might in the District of Columbia and territories regulate the relation of carrier to employé in both inter and intra state transportation. Hence came the dilemma. If the words "any employé," etc., were limited to such employé as was engaged in interstate commerce, as argued in support of the constitutionality of the act, it would destroy its applicability to all railroad employés engaged otherwise than in interstate commerce in the District of Columbia and territories. Mr. Justice White, speaking of this situation, said:

"Thus it would come to pass, if we could bring ourselves to modify the statute by writing in the words suggested—that is, by causing the act to read 'any employé when engaged in interstate commerce'— we would restrict the act as to the District of Columbia and the territories, and thus destroy it in an important particular. To write into the act qualifying words, therefore, would be but adding to its provisions in order to save it in one aspect, and thereby to destroy it in another; that is, to destroy in order to save and to save in order to destroy."

He then adds:

"Of course, if it can be lawfully done, our duty is to construe the statute so as to render it constitutional. But this does not imply, if the text of an act is unambiguous, that it may be rewritten to accomplish that purpose. Equally clear is it, generally speaking, that, where a statute contains provisions which are constitutional and others which are not, effect may be given to the legal provisions by separating them from the illegal. But this applies only to a case where the provisions are separable and not dependent one upon the other, and does not support the contention that that which is indivisible may be divided. Moreover, even in a case where legal provisions may be severed from those which are illegal, in order to save, the rule applies

only where it is plain that Congress would have enacted the legislation with the unconstitutional provisions eliminated."

Because, therefore, of the disposition of the Supreme Court uniformly shown in prior cases of like character to that now before us, we cannot believe the Employers' Liability Cases, involving as they did a totally different subject and one complicated by statutory provisions which would have been irreconcilable if the desired limitation had been imposed, were intended to be applicable to a case like this, or that on their authority we are required to overturn a well understood national policy concerning a troublesome interracial question.

The doctrine of this court as announced in Denver & R. G. R. Co. v. Wagner, 92 C. C. A. 527, 167 Fed. 75, 81, and that of the Supreme Court as stated in the Employer's Liability Cases, is that the legal provisions of the statute may be severed from those which are illegal, "where it is plain that Congress would have enacted the legislation with the unconstitutional provisions eliminated." Applying this rule to the present case, we have no doubt the Legislature of Oklahoma would have enacted the statute in question had it in terms related only to domestic transportation. Why? As already pointed out, it knew it could go no further. It knew that legislation regulating interstate commerce was beyond its power. Most obviously, then, it would not have imperiled the separation of the races in domestic transportation which, without doubt, comprehended the great bulk of that which materially concerned the convenience and sensibilities of the people of the state by deliberately invading the forbidden field of interstate commerce.

Our conclusion is that the act of Oklahoma is not violative of the commerce clause of the Constitution.

It is next contended that the demurrer to the bill was improperly sustained because its averments disclosed that the defendant railroad companies were not in fact furnishing for the negro race coaches or waiting rooms equal in point of comfort or convenience to those furnished for the white race; that complainants were thereby damaged and that they could secure relief of this kind as incidental to the injunctive relief prayed for. It is argued that equity has jurisdiction to avoid a multiplicity of suits and also because no adequate remedy could be had at law.

[6] The allegations of the bill thus brought into judgment are as follows:

"That, notwithstanding the terms of said act of Congress and of the Constitution of the state of Oklahoma, the said above-named defendants and each of them are making distinctions in the civil rights of your orators and of all other persons of the negro race and persons of the white race in the conduct and operation of its trains and passenger service in the state of Oklahoma, in this, to wit: that equal comforts, conveniences, and accommodations will not be provided for your orators and other persons of the negro race; that said passenger coaches are not constructed or maintained so as to enable persons of the negro race to be provided with separate and equal toilet and waiting rooms for male and female passengers of said negro race, nor have equal smoking car accommodations, nor separate and equal chair cars, sleeping cars, and dining car accommodations by providing for your orators and

other persons of the negro race who may become passengers on said railroad, that separate waiting rooms with equal comforts and conveniences have been or are bound to be constructed by said defendants and each of them for your orators and other persons of the negro race desiring to become passengers on said railroad, and that said orators are not being and will not be provided with equal accommodations with the white race under the provisions of said act."

These allegations are too vague and uncertain to constitute a cause of action either in equity or at law. Moreover, the suit was instituted before the Oklahoma statute went into effect. Of course, therefore, no cause of action for damages could be stated. But, even if that were possible, such incidental legal relief could not be awarded in this case after the main injunctive relief sought by the bill and which was alone prayed for had been denied. Mitchell v. Dowell, 105 U. S. 430, 26 L. Ed. 1142; Lewis Publishing Co. v. Wyman (C. C. A.) 182 Fed. 13, decided August 20, 1910, and cases cited.

Some questions of practice were argued at the bar and in the brief of counsel, but the disposition of the case on its merits dispenses with any consideration of them.

The decree below is affirmed.

SANBORN, Circuit Judge (dissenting). The fourteenth amendment to the Constitution of the United States provides that:

"No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, * * * nor deny to any person within its jurisdiction the equal protection of the laws."

If each of two citizens of unobjectionable mental, moral, and physical character, one a white man and the other a colored man, tenders and pays to one of the defendant railroad companies in Oklahoma that is operating upon its trains chair cars, sleeping cars, and dining cars the same lawful rate for his transportation between the same places in a chair car, or in a sleeping car, and for the customary use of a dining car on his journey, and the white man is furnished by the company with his ride in a chair car, or in a sleeping car, and with his dinner in the dining car, and the railroad company by authority of the separate coach law of Oklahoma, solely by reason of his color, prevents the colored citizen from riding in or using all of those cars and all other cars of a similar character, ejects him from any such car into which he enters, and refuses to carry him at all unless he rides in an ordinary coach, is the colored citizen accorded "the equal protection of the laws" enjoyed by the white man and the unabridged privileges and immunities of citizenship which he enjoyed before this coach law was enacted? To me this question seems to bear its own answer, and after repeated readings of the opinion of the majority my mind still refuses to assent to any other than the negative answer to this question. The majority answer it in the affirmative. They argue that the railroad companies cannot afford to haul separate chair cars, sleeping cars, or dining cars for colored citizens, and meet their complaint with the felicitous words:

"The principle of equality of service between the two races in Oklahoma contemplates substantial similarity of service, and this only when conditions and circumstances under which it is required are substantially the same."

186 F.—62

But no separate chair cars or sleeping cars or dining cars for the members of the two races are required of the companies to enable them to give to colored citizens all the comforts and conveniences of travel which they furnish to the white citizens. They may furnish them in separate compartments in the same chair cars, sleeping cars, and dining cars that are occupied by the whites, and, if this separate coach law of Oklahoma is unconstitutional, they may provide the colored citizens with equal service in the same cars occupied by white persons without separate compartments.

Nor are the rights of citizens to unabridged privileges and immunities and to the equal protection of the laws measured by the expense or inconvenience to railroad companies that the existence and enforcement of those rights may entail. While the expense and inconvenience to the railroad companies of maintaining separate coaches and compartments for the two races is a matter worthy of serious consideration by a state when it is determining the question whether or not such a requirement is a reasonable exercise of its police power, the constitutional rights of citizens to their privileges and immunities and to the equal protection of the laws are not dependent upon such considerations, nor upon the varying conditions and circumstances which may surround them.

As I understand the fourteenth amendment to the Constitution, the purpose of its enactment, its express terms, and its legal effect are to prohibit the conditioning of the privileges and immunities of citizens and the equal protection of the laws by the respective conditions and circumstances in which citizens may find themselves, and to secure to those suffering under adverse conditions and unfavorable circumstances the same civil rights and the same protection of the laws that the more fortunate and prosperous enjoy. Citizenship, and citizenship alone, under this amendment to the Constitution, entitles every man, white or black, to all his civil rights and privileges unabridged by the action or legislation of any state and to the equal protection of all the laws. Before the law, by the express terms of the fourteenth amendment, all citizens are equal in their civil rights, and the humblest is the peer of the most powerful. It regards a citizen as a citizen, and takes no account of his surroundings or of his color when his civil rights, as guaranteed by this the supreme law of the land, are involved.

Distances in the state of Oklahoma are magnificent, so great that the time necessarily occupied in many journeys within that state far exceeds 12 hours. Would one traveling through the day who was forbidden to purchase and take his dinner in a dining car upon his train which the railroad company furnished to his companion travelers be of the opinion that the service provided for him was equal in convenience or comfort to that furnished to his companions? Would one riding all night upon a train that carried a sleeping car who was legally expelled from or forbidden by law to enter or occupy it believe that he was provided with equality of service, or equal comforts and conveniences with his companions who were permitted to purchase berths and beds therein? Is one who is ex-

cluded from a chair car with the use of which his traveling companions are furnished provided with the same or equal service, convenience, and comfort with his companions? The complaint in this case is not that the state or the defendant railroad companies required white and colored citizens to occupy separate cars or separate compartments. It is that the state of Oklahoma by means of its separate coach law authorizes the defendants to denk to colored citizens facilities, comforts, and conveniences substantially equal to those which they give to white citizens.

Under the common law and under the Constitution of the United States before the enactment of this Oklahoma statute, railroad companies in that state were legally bound to furnish equality of service, comforts, and conveniences of travel to white and colored citizens without discrimination against either. The colored citizen had the legal right to these facilities, comforts, and conveniences, and that right was as effectively protected by the law as was that of the white man. He had the same right as the white citizen to the use of chair cars, dining cars, and sleeping cars furnished by the carrier, and any infringement of that right was as actionable and remediable as was the infringement of any white man's right to such a use.

The fourteenth amendment to the Constitution provides that:

"All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside."

And that:

"No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

This Oklahoma statute provides that the railroad companies in that state shall furnish separate coaches or compartments equal in points of comfort and convenience for the members of the white and the colored races (section 1); that each coach or compartment shall bear letters indicating the race for which it is set apart (section 2); that the railroad companies may haul sleeping cars, dining cars, and chair cars set apart exclusively for white passengers or exclusively for colored passengers (section 7); that any passenger who rides in any coach or compartment not designated for his race, after having been forbidden so to do by the conductor in charge of the train or car, shall be guilty of a misdemeanor and upon conviction thereof shall be fined not less than $5 nor more than $25 (section 6); that any conductor in charge of a train shall have authority to refuse any passenger admittance into any coach in which he is not entitled to ride under the act, and that it shall be his duty to remove from the train or coach any passenger not entitled to ride therein, and that, if he knowingly refuses to do so, he shall be guilty of a misdemeanor and subject to a fine of not less than $50 nor more than $500, and neither the company nor the conductor shall be liable for damages on account of any such removal (section 10). Does not this law abridge

the privileges and immunities held by colored citizens before its passage? They had the same right and privilege as white men to ride in chair cars, in sleeping cars, and in dining cars before this law was passed, and the railroad companies were liable in damages for any infringement of that right. This law deprives them of that right and privilege, and subjects them to a fine of from $5 to $25 for attempting to exercise it; for the railroad companies comply with this law when they set apart and mark for white passengers all their chair cars, all their dining cars, and all their sleeping cars and only furnish separate compartments equal to each other in points of comfort and convenience in coaches, however inferior all these compartments and coaches may be in comfort and convenience to the chair cars, the sleeping cars, and the dining cars. These separate compartments or coaches may be under this law so inconvenient and comfortless that no white passengers will use them, that all the white passengers will ride in the chair cars, or in the sleeping cars so that none but colored citizens can be found in the separate coaches or compartments. Nor may one readily wink so hard as not to perceive that this may be the natural effect of this law; for, if carriers may set apart all their chair cars for white passengers exclusively, their separate compartments for white persons in coaches may be very restricted, and the comforts and conveniences of these coaches very inferior.

Does this act deprive colored citizens of the equal protection of the laws? Before its passage colored citizens had the privilege and right to ride in the chair cars, the sleeping cars, and the dining cars operated by the railroad companies, and that right was protected by the law which gave them damages for its infringements. By the express terms of this statute that protection is withdrawn, they can recover no damages for any infringement of this civil right, and they are subjected to fines of from $5 to $25 for every attempt to exercise it. These considerations leave my mind no avenue of escape from the conclusion that this Oklahoma statute abridges the privileges and immunities of the colored citizens of that state and deprives them of the equal protection of the laws.

Nor is any authority cited by the majority in conflict with this conclusion. None of the laws considered in those cases, neither the statute of Louisiana (Laws of Louisiana, 1890, No. 111, p. 152; Plessy v. Ferguson, 163 U. S. 537, 16 Sup. Ct. 1138, 41 L. Ed. 256), nor the statute of Mississippi of March 2, 1888 (Acts 1888, c. 27), which is considered in Louisville, etc., Railway Company v. Mississippi, 133 U. S. 587, 588, 10 Sup. Ct. 348, 33 L. Ed. 784, nor the act of Kentucky of May 24, 1892 (Laws of Kentucky 1891–1892–1893, c. 40, p. 63), treated in Chesapeake & Ohio Ry. Co. v. Kentucky, 179 U. S. 388, 21 Sup. Ct. 101, 45 L. Ed. 244, either authorized or permitted the railroad companies to deny to colored citizens accommodations equal in convenience and comfort to those provided for white citizens. None of these statutes either empowered or permitted railroad companies to exclude from their chair cars or sleeping cars or dining cars all colored citizens, or to deprive colored pas-

sengers of the same right that the white passengers had to equal accommodations or to legal protection for that right. On the other hand, each of these statutes expressly required the accommodations to the citizens of the two races to be equal, and the Kentucky statute prohibited any "difference or discrimination in the quality, convenience or accommodations in the cars or coaches set apart for white and colored passengers." Section 2.

In Plessy v. Ferguson, 163 U. S. 537, 16 Sup. Ct. 1138, 41 L. Ed. 256, the Supreme Court held only that the Louisiana statute which expressly required the accommodations furnished by the carriers to colored citizens to be equal to those provided for white citizens was not unconstitutional because it required railroad companies to carry the members of the two races in separate coaches or compartments.

The cases of Louisville, etc., Ry. Co. v. Mississippi, 133 U. S. 587, 10 Sup. Ct. 348, 33 L. Ed. 784, and Chesapeake & Ohio Ry. Co. v. Kentucky, 179 U. S. 388, 21 Sup. Ct. 101, 45 L. Ed. 244, were prosecutions of railroad companies for failures to provide separate coaches under the Mississippi and Kentucky statutes cited above, and neither of them presented any question of the rights of colored passengers under the fourteenth amendment or under the statutes themselves, as is clearly stated by the Supreme Court in 133 U. S. 589, 10 Sup. Ct. 348, 33 L. Ed. 784, in these words:

"It will also be observed that this is not a civil action brought by an individual to recover damages for being compelled to occupy one particular compartment, or prevented from riding on the train, and hence there is no question of personal insult or alleged violation of personal right."

In Chiles v. Chesapeake & Ohio Ry. Co., 218 U. S. 71, 30 Sup. Ct. 667, 54 L. Ed. 936, the only question presented was whether or not a railroad company in the absence of statutory authority might lawfully separate white from colored passengers on condition that it furnished them equal accommodations, and its right so to do was upheld. The fourteenth amendment is leveled only at the action of a state, and, as no state action was in question in this case, the rights and privileges of colored citizens under that amendment were neither considered nor adjudged.

The Oklahoma statute expressly authorizes every railroad company doing business in that state, by its mere arbitrary will, to mark all its chair cars, all its sleeping cars, and all its dining cars hauled in that state for white persons exclusively and to provide none for colored persons, or to mark them all for colored persons exclusively and to haul none for white persons. It thereby authorizes any such railroad company to deprive all passengers for whom it does not mark these classes of cars of the privilege and right to use them which they had before this act was enacted of the equal protection of that right by the laws, which they had before that act was passed, and subjects them to a fine for attempting to exercise this right. Suppose the railroad companies doing business in Oklahoma should mark all their chair cars, all their sleeping cars, and all their dining cars for colored passengers exclusively, should exclude all

white passengers therefrom, and should provide no cars of these classes for white passengers in the same way that they now designate all such cars for white passengers exclusively, exclude colored passengers, and haul no cars of these classes for colored passengers; would any one conceive that white passengers were furnished with equality of service with colored passengers, or that their privileges and immunities were not abridged by this law, or that they were not deprived of the equal protection of the laws thereby, when in this way they would be deprived of all protection of their previous right and privilege to the equal use of such cars and made liable to fine for attempting to exercise that right, while the same right and privilege of colored persons to that use would remain undisturbed and securely protected by the law?

The validity of this statute under the fourteenth amendment is not conditioned by the character of the parties empowered to determine what citizens may use the chair cars, the sleeping cars, and the dining cars. It is not conditioned by the answer to the question whether such parties are public officials or private citizens. Nor is it conditioned by the manner of the exercise of this power or by the answer to the question whether it is exercised fairly and justly or "with an evil eye and an unequal hand"; for the proposition is self-evident that whenever a privilege and right of person or of property, whenever any civil right of any persons or of any class of persons, or its legal protection is made dependent by law upon the arbitrary will of third persons that right is not only abridged, but it is destroyed, it is no longer a right, and the equal protection of the law is entirely withdrawn from it.

While the Supreme Court in Yick Wo v. Hopkins, 118 U. S. 356, held at page 373, 6 Sup. Ct. 1064, at page 1073 (30 L. Ed. 220), that, "though the law itself be fair on its face and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the Constitution," yet it had also held in the earlier part of the opinion in that case that an ordinance of the city of San Francisco violated the fourteenth amendment of the Constitution, and was void because it made the right and privilege of citizens to conduct laundries in that state dependent upon the arbitrary will of the board of supervisors. It supported that conclusion by extended argument and numerous authorities, and said:

"When we consider the nature and theory of our institutions of government, the principles upon which they are supposed to rest, and review the history of their development, we are constrained to conclude that they do not mean to leave room for the play and action of purely personal and arbitrary power; * * * for the very idea that one man may be compelled to hold his life, or the means of living, or any material right essential to the enjoyment of life, at the mere will of another, seems to be intolerable in any country where freedom prevails, as being the essence of slavery itself." 118 U. S. 369, 370, 6 Sup. Ct. 1064, 1071 (30 L. Ed. 220).

This statute which authorizes railroad companies at their arbitrary will to deprive citizens of their civil rights, which takes away all

remedy for such a deprivation and subjects those so deprived to fines for endeavoring to enforce those rights, is as obnoxious to the Constitution as a law which directly destroys them.

The true interpretation of the fourteenth amendment is to be found in the decisions of the Supreme Court when it was composed of those great jurists who had been active in public affairs when it was proposed and enacted and who could not fail to know its purpose and its meaning. In Strauder v. West Virginia, 100 U. S. 303, 306, 25 L. Ed. 664, that court said:

"This is one of a series of constitutional provisions having a common purpose, namely, securing to a race recently emancipated, a race that through many generations had been held in slavery, all the civil rights that the superior race enjoyed. * * * They especially needed protection against unfriendly action in the states where they were resident. It was in view of these considerations the fourteenth amendment was framed and adopted. It was designed to assure to the colored race the enjoyment of all the civil rights that under the law are enjoyed by white persons, and to give to that race the protection of the general government, in that enjoyment, whenever it should be denied by the states. It not only gave citizenship and the privilege of citizenship to persons of color, but it denied to any state the power to withhold from them the equal protection of the laws and authorized Congress to enforce its provisions by appropriate legislation. * * * It ordains that no state shall deprive any person of life, liberty, or property without due process of law, or deny to any person within its jurisdiction the equal protection of the laws. What is this but declaring that a law in the states shall be the same for the black as for the white; that all persons, whether colored or white, shall stand equal before the laws of the states; and, in regard to the colored race for whose protection the amendment was primarily designed, that no discrimination shall be made against them by law because of their color? The words of the amendment, it is true, are prohibitory, but they contain a necessary implication of a positive immunity, or right, most valuable to the colored race—the right to exemption from unfriendly legislation against them distinctly as colored—exemption from legal discrimination implying inferiority in civil society, lessening the security of their enjoyment of the rights which others enjoy and discriminations which are steps towards reducing them to the condition of a subject race."

This separate coach law of the state of Oklahoma, with its specious requirement that the separate coaches or compartments it requires shall be "equal in all points of comfort and convenience," with its actual provision that colored citizens may be excluded without remedy by carriers from all the more comfortable and convenient cars they haul upon their trains in Oklahoma, from the chair cars, from the sleeping cars and from the dining cars, with its deprivation of colored passengers of their privilege and right which they had before this law was enacted, to ride in and use such cars and their comforts and conveniences equally with white passengers, with its deprivation of the protection of that right by the laws which white passengers still enjoy, and with its imposition of fines for attempting to enforce their equal right, in my opinion defies the spirit, defeats the purpose, violates the express prohibition of the fourteenth amendment, is unconstitutional and void. And as the complainants allege in their bill and the demurrers admit that the defendants under the authority of this law are continually depriving, and will continue to deprive, these complainants of these rights secured to them by this amendment, unless they are enjoined

by the courts, I am unable to escape the conclusion that they are entitled to an injunction to prevent what seem to me to be acts whose only, but futile, excuse is this law of the state which violates the Constitution.

This view of the case renders unnecessary any discussion of the question whether this statute is void because it constitutes a breach of the contract between the people of the state of Oklahoma and the people of the nation made by the latter's acceptance of the condition of their admission as a state prescribed by section 3 of the enabling act (Statutes of Oklahoma 1909, p. 50) that:

"The Constitution shall be republican in form and shall make no distinction in civil or political rights on account of race or color, and shall not be repugnant to the Constitution of the United States and the principles of the Declaration of Independence."

But I do not desire to be deemed to assent to any proposition that any terms of the contract between the state and the nation made at the time of its admission may be violated by the former with impunity after the acceptance of its Constitution and its admission into the Union. That question was much debated 60 years ago, without as within the courts. Leaving it aside here, the fact that the enabling act required, and the people of Oklahoma assented, to the agreement that there should be no distinction between civil and political rights on account of race or color in that state, is very persuasive that they and the Congress of the United States understood this to be the substantial meaning of the Constitution of the United States, and in my opinion no such distinction should now be permitted to be perpetuated.

There is another reason why the bill in this case should be sustained. The majority concede that this separate coach law violates the commercial clause of the Constitution if it embraces or relates to interstate commerce at all. Hall v. De Cuir, 95 U. S. 485, 24 L. Ed. 547; County of Mobile v. Kimball, 102 U. S. 691–697, 26 L. Ed. 238; Brown v. Houston, 114 U. S. 622, 5 Sup. Ct. 1091, 29 L. Ed. 257; Wabash, etc., Ry. Co. v. Illinois, 118 U. S. 557, 566–577, 7 Sup. Ct. 4, 30 L. Ed. 244; Bowman v. Chicago, etc., Ry. Co., 125 U. S. 465, 488–499, 8 Sup. Ct. 689, 1062, 31 L. Ed. 700.

By its express terms, which are free from all ambiguity, it applies to all commerce in the transportation by railroad of passengers in the state of Oklahoma, to interstate to the same extent as to intrastate commerce, to passengers who are brought into, to those who are carried out of, and to those who are carried through the state to the same extent as to those who are transported only within its borders. And it is a penal statute which subjects the former as well as the latter to fines for its violation. It first provides that every railroad company doing business in that state shall furnish separate coaches and waiting rooms for the white and negro races, and then contains the following enactments which must be amended by judicial construction by the insertion of the words contained in the parentheses below or by words of similar import in order to exclude interstate commerce from its terms and effect:

"It shall be unlawful for any person (except passengers who are brought into, or carried through, or out of the state of Oklahoma), to use, occupy or remain in any waiting room, toilet room, or at any water tank in any passenger depot in that state set apart to a race to which he does belong." Section 2.

"The term negro as used herein includes every person of African descent as defined by the Constitution" (except passengers who are brought into, or carried through, or out of the state of Oklahoma). Section 3.

"If any passenger (except passengers brought into, or carried through, or out of the state of Oklahoma), upon a railway train, * * * shall ride in any coach, or compartment not designated for his race, after having been forbidden to do so by the conductor of the train or car, or shall remain in any waiting room not set apart for the race to which he belongs, he shall be guilty of a misdemeanor and upon conviction shall be fined not less than five nor more than twenty-five dollars. Should any passenger (except passengers brought into, or carried through, or out of the state of Oklahoma), refuse to occupy the coach or compartment or room to which he or she is assigned by the officer of such railway company, said officer shall have the power to refuse to carry such passenger on his train, and should any passenger (except pasengers brought into, carried through, or out of the state of Oklahoma), or any other person not a passenger, for the purpose of occupying or waiting in such sitting or waiting room not assigned to his or her race. enter said room, said agent shall have power, and it is made his duty, to eject such person from such room, and for such neither they nor the railroad company which they represent, shall be liable for damages in any courts of this state." Section 6.

" * * * * Provided nothing herein contained shall be construed to prevent any railway companies in this state from hauling sleeping cars, dining or chair cars attached to their trains to be used exclusively by either white or negro passengers. separately but not jointly." (Except that all such cars shall be equally open to the joint use of those white and negro passengers who are brought into, carried through, or out of the state of Oklahoma.) Section 7.

When the Supreme Court of a state has construed or has clearly indicated by its decisions that it will interpret a statute of a state that by general terms embraces subjects within and without the constitutional power of the state to be limited in its meaning and effect to the former, that construction necessarily prevails in all the courts of the state, and practically amends the statute and restricts its practical operation and effect to subjects within the constitutional power of the state. As no rights of citizens of the United States under its Constitution are or can be injuriously affected by a statute thus limited, the Supreme Court of the United States and this court have held that a state law thus amended by judicial legislation and limited by the highest court of the state that enacted it may be permitted to stand, although it would have been unconstitutional and void if the Supreme Court of the state that enacted it had interpreted it to embrace subjects without as well as within the constitutional power of the state, or if in the absence of construction by the highest court of the state it embraced such subjects by its terms under the established canons of interpretation. This, and this only, as I understand them, is the meaning and the legal effect of the decisions relative to this question in Louisville, etc., Ry. Co. v. Mississippi, 133 U. S. 587, 591, 10 Sup. Ct. 348, 33 L. Ed. 784, Chesapeake & Ohio Ry. Co. v. Kentucky, 179 U. S. 388, 395, 21 Sup. Ct. 101, 45 L. Ed. 244, and Butler Bros. Shoe Co. v. United States Rubber Company, 84 C. C. A. 167, 185, 156 Fed. 1, 19, cited by the majority. In each of

these cases the Supreme Court of the state had either expressly interpreted (133 U. S. 591, 10 Sup. Ct. 348, 33 L. Ed. 784), or had indicated that it would interpret (179 U. S. 395, 21 Sup. Ct. 101, 45 L. Ed. 244; 156 Fed. 19, 84 C. C. A. 185), the statute in question to be limited in its meaning and effect to the subjects within the constitutional power of the state. These decisions, however, fail to consider or to determine, as it seems to me, the question which the statute in hand presents. The Supreme Court of Oklahoma has not construed, restricted, or limited this law, nor has it given any intimation that it will ever do so. If, when this statute comes before that court for construction, it holds that this law means what it clearly and repeatedly declares, that every passenger whether interstate or intrastate is subject to its provisions and its fines, the statute is unquestionably violative of the commercial clause of the Constitution and void. And, in the absence of any construction by that court, this statute must be equally violative of the Constitution if its true interpretation and effect is to subject interstate passengers to its provisions and penalties. We are therefore remitted in the consideration and decision of this case to the law and to the established rules for the construction of statutes for an answer to the question whether or not the national courts may by judicial construction amend a statute which in plain terms applies without discrimination to subjects without and subjects within the constitutional power of the state so as to exclude the former and include the latter in order to take the law out from under the ban of the Constitution. This question, under circumstances similar to those under which this statute comes before this court, has been repeatedly answered by the Supreme Court and by this court.

In United States v. Reese, 92 U. S. 214, 218, 221, 23 L. Ed. 563, Congress had enacted a law which prescribed punishment for the unlawful refusal to accept votes from all voters while its constitutional power was limited to prescribing the penalty for refusing to receive votes "on account of the race, color, or previous condition of servitude of the voter." The contention of the government was that the act was constitutional as to all refusals to receive votes on account of the race, color, etc., of the voter, and that it could be sustained to this extent and permitted to fail in other cases, because the two classes of cases and the two portions of the act applicable to them were readily separable. But the argument failed. The Supreme Court said:

"We are therefore directly called upon to decide whether a penal statute, which is in general language broad enough to cover wrongful acts without as well as within the constitutional jurisdiction, can be limited by judicial construction so as to make it operate only on that which Congress may rightfully prohibit and punish. For this purpose, we must take these sections of the statute as they are. We are not able to reject a part which is unconstitutional, and retain the remainder, because it is not possible to separate that which is unconstitutional, if there be any such, from that which is not. The proposed effect is not to be attained by striking out or disregarding words that are in the section, but by inserting those that are not now there. Each of the sections must stand as a whole or fall together. The language is plain. There is no room for construction, unless it be as to the effect of the Consti-

tution. The question, then, to be determined, is whether we can introduce words of limitation into a penal statute so as to make it specific, when, as expressed, it is general only."

In Trade-Mark Cases (United States v. Steffens) 100 U. S. 82, 25 L. Ed. 550, Congress possessed the constitutional authority to protect trade-marks in interstate and foreign commerce, and it enacted a statute which by its terms protected trade-marks in all commerce. The court was urged to restrict this law by construction to trademarks in interstate and foreign commerce and to sustain it. But it cited and quoted from the opinion in the Reese Case, and held the act unconstitutional.

In Virginia Coupon Cases (Poindexter v. Greenhow) 114 U. S. 270, 5 Sup. Ct. 903, 962, 29 L. Ed. 185, the same argument was again met and overthrown with this declaration, which was subsequently quoted and affirmed in Income Tax Cases (Pollock v. Farmers' Loan & Trust Co.) 158 U. S. at page 636, 15 Sup. Ct. at page 920 (39 L. Ed. 1108):

"It is undoubtedly true that there may be cases where one part of a statute may be enforced as constitutional, and another be declared inoperative and void, because unconstitutional: but these are cases where the parts are so distinctly separable that each can stand alone, and where the court is able to see and to declare that the intention of the Legislature was that the part pronounced valid should be enforceable, even though the other part should fail. To hold otherwise would be to substitute for the law intended by the Legislature one they may never have been willing by itself to enact."

In Spraigue v. Thompson, 118 U. S. 90, 94, 6 Sup. Ct. 988, 30 L. Ed. 115, the Legislature of Georgia had enacted a statute which would have been valid if it had not contained certain unconstitutional exceptions. The Supreme Court of that state sustained it upon the ground that the body of the act was readily separable from the exceptions. The Supreme Court reversed that decision, and said:

"It was held, however, by the Supreme Court of Georgia, in the case now before us, that so much of the section as makes these illegal exceptions may be disregarded. so that the rest of the section as thus read may stand, upon the principle that a separable part of a statute, which is unconstitutional, may be rejected, and the remainder preserved and enforced. But the insuperable difficulty with the application of that principle of construction to the present instance is that by rejecting the exceptions intended by the Legislature of Georgia the statute is made to enact what confessedly the Legislature never meant. It confers upon the statute a positive operation beyond the legislative intent, and beyond what any one can say it would have enacted in view of the illegality of the exceptions."

In Chicago, Milwaukee & St. Paul Ry. Co. v. Westby, 102 C. C. A. 65, 78, 178 Fed. 619, 632, the same question came before this court under circumstances similar to those presented in the case at bar, and after a review of the foregoing authorities, and many others, it held that:

"A statute of a state which includes by general language in a single class those within and those without the constitutional class may not be limited by judicial construction to the latter class and then sustained."

While it is true that, where a statute is constitutional in part and unconstitutional in part, the former part in proper cases may be sustained, while the latter part fails, yet indispensable conditions of such

a result are: (1) That the constitutional part and the unconstitutional part are capable of separation so that each may be read and may stand by itself (Baldwin v. Franks, 120 U. S. 679, 685, 686, 7 Sup. Ct. 656, 30 L. Ed. 766); and the constitutional and unconstitutional parts of this statute are so consolidated in its terms which are made applicable to "every passenger" and "every railroad company" without distinction between interstate and intrastate passengers, that such a separation is impossible; (2) that the insertion of words or terms is not necessary to separate the constitutional part from the unconstitutional part and to give effect to the former only (Allen v. Louisiana, 103 U. S. 80, 84, 26 L. Ed. 318; United States v. Reese, 92 U. S. 214, 218, 221, 23 L. Ed. 563; The Trade-Mark Cases, 100 U. S. 82, 99, 25 L. Ed. 550; United States v. Harris, 106 U. S. 629, 641, 642, 1 Sup. Ct. 601, 27 L. Ed. 290; Virginia Coupon Cases [Poindexter v. Greenhow] 114 U. S. 270, 305, 5 Sup. Ct. 903, 962, 29 L. Ed. 185; Spraigue v. Thompson, 118 U. S. 90, 94, 6 Sup. Ct. 988, 30 L. Ed. 115; Income Tax Cases [Pollock v. Farmers' Loan & Trust Co.] 158 U. S. 601, 636, 15 Sup. Ct. 912, 39 L. Ed. 1108; Cella Commission Co. v. Bohlinger, 78 C. C. A. 467, 471, 147 Fed. 419, 423, 8 L. R. A. [N. S.] 537; Ballard v. Mississippi Cotton Oil Co., 81 Miss. 507, 34 South. 554, 555, 62 L. R. A. 407, 95 Am. St. Rep. 476), and the statute in hand cannot be so amended by the omission of words or terms or in any other way than by the insertion thereof (witness the sections quoted above and the words and terms set forth in the parentheses which are requisite to conform the statute to a constitutional enactment); (3) that the unconstitutional part is not so connected with the general scope of the law that the court cannot clearly see that the Legislature would have enacted and intended to give effect to the constitutional part, although the unconstitutional part was stricken out. To my mind this statute clearly discloses that the patent intention of the Legislature of Oklahoma was to exclude not only colored intrastate passengers, but every colored passenger from the coaches and cars occupied by white persons. The statute would have failed of its entire purpose if interstate colored passengers had not been excluded thereby, for a part of the colored passengers in the coaches and cars occupied by the white persons were as obnoxious to the Legislature as all of them. The members of the Legislature never had any intention to pass any law that would have secured or permitted such a result and it is far from clear that they would have passed the statute with an exception of interstate passengers. This conclusion is sustained, not only by the reason of the case, but by the established rules for the interpretation of the statute itself. Its terms are unambiguous and its meaning evident. It subjects "every passenger" to its provisions and penalties. Where a statute is unambiguous and its meaning is evident, it must be held to mean what it clearly expresses and no room is left for construction. United States v. Ninety-Nine Diamonds, 139 Fed. 961, 964, 72 C. C. A. 9, 2 L. R. A. (N. S.) 185; Brun v. Mann, 151 Fed. 145, 157, 80 C. C. A. 513, 12 L. R. A. (N. S.) 154.

The fact that the Legislature subjected "every passenger" to the

provisions of the law and made no exception of interstate passengers raises a conclusive legal presumption that they intended to make no such exception, and in my opinion it would be unjustifiable judicial legislation for the courts to do so.   Cella Commission Co. v. Bohlinger, 78 C. C. A. 467, 473, 147 Fed. 419, 425, 8 L. R. A. (N. S.) 537; Omaha Water Co. v. City of Omaha, 77 C. C. A. 267, 147 Fed. 1, 12 L. R. A. (N. S.) 736; Madden v. Lancaster County, 12. C C. A. 566, 572, 65 Fed. 188, 194; Wrightman v. Boone County, 31 C. C. A. 570, 572, 88 Fed. 435, 437; Union Central Life Ins. Co. v. Champlin, 54 C. C. A. 208, 210, 116 Fed. 858, 860.   It seems to me that this statute cannot be restricted lawfully by construction to intrastate passengers because the part applicable to that class is not separable from the part applicable to the unconstitutional class, the interstate passengers, so that each part may be read and may stand by itself, because it is not apparent that the Legislature would have passed the act if it had been limited to the constitutional class, but it is plain that they would not have done so, because the Legislature excepted neither class, and the legal presumption is that it intended to except none, because the statute cannot be restricted to the constitutional class by the elimination of words or clauses, that result can be attained only by the introduction into it of express terms or words, and because its terms are plain and its meaning is evident, and it ought not to be construed to mean that which it does not express.   In view of these considerations, rules, and authorities, my opinion is that the separate coach law of Oklahoma applies to interstate passengers and interstate commerce to the same extent that it does to intrastate passengers and commerce, and that for that reason it is violative of the commercial clause of the Constitution and void.   For the reasons which have now been stated, at perhaps too much length, I think that the decree below should be reversed, that the demurrers of the defendants should be overruled, and that they should be required to answer the bill.