# COFIELD v. FARRELL *et al.*

No. 2862. Opinion Filed September 2, 1913.

(134 Pac. 407.)

1. ELECTIONS — Constitutional Law—Qualifications of Voters—Control by State. Const. sec. 4a, of article 3 (section 46, Williams' Ann. Const. Okla.) of the Constitution is not repugnant to the fourteenth amendment to the federal Constitution.

> (a) The whole power of determining who shall exercise the elective franchise in the states, whether in respect to the election of state or national officers, is with the states themselves, and with each state in reference to its own citizens, so long as the states do not deny or abridge such right "on account of race, color, or previous condition of servitude."

2. SAME—Right of Suffrage—Constitutional Guaranty. Const. sec. 4a, of article 3 (section 46, Williams' Ann. Const. Okla.) of the Constitution does not violate the provisions of the fifteenth amendment to the federal Constitution.

3. SAME—Qualifications of Voters—Constitutional Provision—Validity. Const. sec. 4a, of article 3 (section 46, Williams' Ann. Const. Okla.) of the Constitution is not invalid on account of section 3 of the Enabling Act (Act June 16, 1906, c. 3335, 34 St. at L. 269), which provides that said Constitution shall "make no distinction in civil or political rights on account of race or color," and that said state shall never enact any law restricting or abridging the right of suffrage "on account of race, color, or previous condition of servitude."

(Syllabus by the Court.)

*Error from District Court, Logan County;*
*A. H. Huston, Judge.*

Action by Theodore Cofield against Thomas Farrell and others. Judgment for defendants, and plaintiff brings error. Affirmed.

*Burford & Burford* and *Devereux & Hildreth,* for plaintiff in error.

*C. G. Horner,* for defendants in error.

WILLIAMS, J. This proceeding in error is to review the proceedings in an action commenced in the lower court

by the plaintiff in error, as plaintiff, against the defendants in error, Thomas Farrell, L. F. Leach, and T. Elder, as defendants. The parties hereto will be hereinafter referred to as follows: The plaintiff in error as plaintiff, and defendants in error as the election officers. Plaintiff sued said election officers for damages on the ground that he was deprived of his right to vote by reason of section 4a, article 3, of the Constitution of this state (section 46, Williams' Ann. Const. Okla.), alleging in substance, that he had been for many years, prior to the date of the state election held on the 8th day of November, 1910, a resident and inhabitant of the precinct in which the said election officers held said election; that he was born in the United States, and a citizen of the territory of Oklahoma prior to the erection of the state, and ever since said time he had been a resident of said precinct; that he was 66 years of age, had never been adjudged guilty of a felony, nor had he ever been kept in a poorhouse or asylum, at public expense, nor had he ever been, nor was he on the 8th day of November, 1910, in a public prison, nor was he an idiot or lunatic, and that he had all the qualifications entitling him to vote under the Constitution of the state of Oklahoma, and of the United States, and was a qualified elector of said state of Oklahoma; that pursuant to the said laws, to wit, on July 8, 1910, he duly qualified by registration as an elector, and obtained from the registration officer a registration certificate; that prior to the emancipation proclamation, plaintiff was a slave, held in bondage and involuntary servitude, and by reason of said proclamation he was emancipated and obtained his civil rights; that he is a member of the negro race; that "he is unable to read or write any section of the Constitution of the state of Oklahoma, and that he was not, on January 1, 1866, or at any time prior thereto, entitled to vote at any election under any form of government, and that he is not a lineal descendant of a person who was entitled to vote on January 1, 1866, or at any time

Vol. 38—39

prior thereto, and at no time during his life has he re-
sided in any foreign nation, but that he has been since his
birth, a resident of the United States, and that his ancestors
since they were brought into the United States from Africa
have been slaves, and that the plaintiff has been a citizen of
the United States ever since the laws of the United States were
passed and ·the amendment to the Constitution thereof con-
ferring civil rights upon former slaves of African descent."
He further alleges that at said election held on the 8th day
of November, 1910, there were to be chosen by the voters
state officials and members of ·Congress;· that he tendered
his vote to said election officials, who were at said election
and at said time the duly appointed and qualified and acting
inspector of, and judges of, election at said voting precinct
No. 1, which was the proper place at ·which said plaintiff
should have voted and was entitled to vote, and demanded
the right to exercise the elective franchise and to cast his bal-
lot at said election, but that said officials refused to furnish
plaintiff a ballot, or permit him to vote at said election either
for state officers or for members of Congress; that it was his
intention to vote for a member of Congress; that said elec-
tion officers refused to allow plaintiff to exercise his right
of suffrage on account of said amendment to the Constitu-
tion of said state (section 4a, article 3) which was adopted
on the 2d day of August, 1910; that said amendment is re-
pugnant to the fourteenth and fifteenth amendments of the
federal Constitution, and the provisions, of the Enabling
Act under which the state was erected.    Defendants hav-
ing interposed a demurrer to said petition, the same was
sustained.   Plaintiff declining to plead further, judgment was
rendered in favor of the defendants (election officers).    The
action of the lower court is now properly before this court for
review by proceeding in error.

     The following questions are presented for our considera-
tion:   (1) Is said section 4a, article 3, of the Constitution

of this state, adopted on August 2, 1910, in conflict with the fourteenth amendment to the federal Constitution? (2) Is said section 4a, article 3, in conflict with the fifteenth amendment to the federal Constitution? (3) Is said section 4a, article 3, invalid on account of the Enabling Act, under which the state of Oklahoma was erected?

Section 4a is as follows:

"No person shall be registered as an elector of this state, or be allowed to vote in any election herein, unless he be able to read and write any section of the Constitution of the state of Oklahoma; but no person who was, on January 1, 1866, or at any time prior thereto entitled to vote under any form of government, or who, at that time, resided in some foreign nation, and no lineal descendant of such person shall be denied the right to register and vote because of his inability to so read and write sections of such Constitution. Precinct election inspectors having in charge the registration of electors shall enforce the provisions of this section at the time of registration, provided registration be required. Should registration be dispensed with, the provisions of this section shall be enforced by the precinct election officers when electors apply for ballots to vote."

That said section is not in conflict with the fourteenth amendment to the federal Constitution has heretofore been held, not only by this court, but also by the Criminal Court of Appeals. *Atwater v. Hassett et al.*, 27 Okla. 292, 111 Pac. 802; *Ex parte Beall et al.*, 28 Okla. 445, 114 Pac. 724; *Ex parte Show*, 4 Okla. Cr. 416, 113 Pac. 1062.

Suffrage is purely a political right, granted by the sovereign power to those worthy and competent to participate in governmental affairs. It is neither a natural nor fundamental right. *Minor v. Happersett*, 21 Wall, 162, 22 L. Ed. 629; *Spencer v. Board of Registration*, 1 McArthur (8 D. C.) 169, 29 Am. Rep. 582; *United States v. Anthony*, 11 Blackf. 200, Fed. Cas. No. 16,110; Jameson on Constitutional Conventions, sec. 336; *Van Valkenburg v. Brown*, 43 Cal. 43, 13 Am. Rep. 136.

With the exception of the District of Columbia and the territories of the United States, in both of which Congress has exclusive jurisdiction, the question, who are voters, and who are not, is wholly a matter of state authority and state discretion, subject to the following limitations: (1) That those who in each state are qualified voters for members of the most numerous branch of its Legislature are by the federal Constitution entitled to vote for representatives in Congress; (2) that citizens of the United States shall not, by any state, be excluded from voting, or such right abridged "on account of race, color, or previous condition of servitude"; (3) that no state shall adopt any Constitution, or exercise any power, that is destructive of "a republican form of government." With these limitations the whole power of determining who shall exercise the elective franchise in the states, whether in respect to the election of state or federal officers, is with the states themselves, and with each state in reference to its own citizens. So long as the states keep within these limits Congress has nothing to do with the question, simply because it has no power of action.

If the right of voting had been secured to all citizens of the United States by the fourteenth amendment there would have been no necessity for the subsequent proposal and adoption of the fifteenth amendment to protect its citizens against any exclusion from voting "on account of race, color. or previous condition of servitude." For such right would·have already been guaranteed by the fourteenth amendment, and nothing could have been accomplished by the adoption of the fifteenth amendment—a mere surplusage act, or at most but a specific guaranty of what was embraced in the more comprehensive provisions of the fourteenth amendment. Again in the second section of the fourteenth amendment the provision that, "when the right to vote at any election for the choice of electors for president and vice president of · the United States, representatives in Congress, the executive and judicial officers of a state, or the members of the Legislature

thereof, is denied to any of the male inhabitants * * * or in any way abridged, except for participation in rebellion, or other crime, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such state," is a recognition that the states retain the power to deny or abridge the right of suffrage on any ground or for any cause. The fourteenth amendment recognizes the power in the states, simply providing for a reduction of the representation in Congress from such states as exercise this power except for participation in rebellion or the commission of other crimes. This provision is inconsistent with the idea that section 1 of said amendment had guaranteed the right of voting as one of the "privileges or immunities of citizens of the United States." The fourteenth amendment does not restrain the authority of the states from in any way regulating the voting franchise by any qualifications or limitations they may see fit to adopt.

Citizenship and suffrage are separate. Suffrage is not one of the universal or inalienable rights with which men are endowed by their Creator. It is merely a privilege which may be granted by the sovereign power at its option and election, and under reasons that are satisfactory to such grantor and not reviewable by any other power, except that "it shall not be denied or abridged by the state on account of race, color, or previous condition of servitude." *Gougar v. Timberlake et al.*, 148 Ind. 38, 46 N. E. 339, 37 L. R. A. 644, 62 Am. St. Rep. 487; *Anderson v. Baker*, 23 Md. 531; *Kinneen v. Wells*, 144 Mass. 497, 11 N. E. 916, 59 Am. Rep. 105; *Stone v. Smith*, 159 Mass. 413, 34 N. E. 521; *Van Valkenburg v. Brown, supra; United States v. Anthony, supra*, Fed. Cas. No. 14,459; *United States v. Reese*, 92 U. S. 214, 23 L. Ed. 563; *United States v. Cruikshank*, 92 U. S. 542, 23 L. Ed. 588; *Minor v. Happersett, supra; Pope v. Williams, supra*. The state may prescribe any qualification of age,

sex, residence, property, or education, or any other qualification that it may see fit to prescribe, providing that suffrage or the right to vote shall not be denied or abridged by it "on account of race, color, or previous condition of servitude." As said by Mr. Justice Peckham in *Pope v. Williams,* 193 U. S. 621, 24 Sup. Ct. 573, 48 L. Ed. 817, in announcing the unanimous opinion of the court, if in granting the right of suffrage the state does not abridge or deny the same on account of race, color or previous condition of servitude, "the question whether the conditions prescribed by the state might be regarded by others as reasonable · or unreasonable is not a federal one." To the same effect, see opinion by Mr. Justice Hunt, sitting on the circuit, in *United States v. Anthony, supra.*

Before the fourteenth amendment was adopted, the whole subject of the elective franchise was in the exclusive control of the several states. The right, or privilege, of voting was not affected by the adoption of the fourteenth amendment, and is still a right or privilege resting under the Constitution or laws of each state, in no manner being a right or privilege derived from the Constitution or laws of the United States. Further, notwithstanding the adoption of the fifteenth amendment, the entire · control over suffrage and the power to grant the right or privilege and to regulate its exercise is still left or retained with the several states, with the single restriction that it must not be denied or abridged "on account of race, color, or previous condition of servitude." The right to vote not being a civil right or privilege, but altogether a political right not necessarily resulting from citizenship, the judicial power of the United States has no jurisdiction whatever over the question of its acquisition, except in cases falling within and governed by the fifteenth amendment. *Slaughter-House Cases,* 16 Wall. 79, 21 L. Ed. 395; *Ward v. Maryland,* 12 Wall. 418, 20 L. Ed. 449; *Neal v. Delaware,* 103 U. S. 370, 26 L. Ed. 567; *Ex parte Yarbrough,* 110 U. S. 651, 4 Sup. Ct. 152, 28 L. Ed. 274; *Lanz v. Randall,* 4 Dill.

425, 14 Fed. Cas. No. 8,080, p. 1131; *Amy v. Smith,* 1 Litt. (Ky.) 326; *Short v. State,* 80 Md. 401, 31 Atl. 322, 29 L. R. A. 404; *Anderson v. Baker,* 23 Md. 531.

In the *Slaughter-House Cases,* 16 Wall. 36, 21 L. Ed. 395, in an opinion by Mr. Justice Miller, it is said:

"Of the privileges and immunities of the citizens of the United States, and of the privileges and immunities of the citizens of the state, and what they respectively are, we will presently consider; but we wish to state here that it is only the former which are placed by this clause under the protection of the federal Constitution, and that the latter, whatever they may be, are not intended to have any additional protection by this paragraph of the amendment."

In the same opinion he also quoted with approval the language of Mr. Justice Washington, sitting on the circuit, in *Corfield v. Coryell,* 4 Wash. C. C. 371, Fed. Cas. No. 3,230, wherein he said:

"The inquiry is, What are the privileges and immunities of citizens of the several states? We feel no hesitation in confining these expressions to those privileges and immunities which are * * * fundamental, which belong of right, to the citizens of all free governments, and which have, at all times, been enjoyed by citizens of the several states which compose this Union, from the time of their becoming free, independent, and sovereign."

Again, in the same opinion, Mr. Justice Miller says:

"Was it the purpose of the fourteenth amendment, by the simple declaration that no state should make or enforce any law which shall abridge the privileges and immunities of citizens of the United States, to transfer the security and protection of all the civil rights which we have mentioned, from the states to the federal government?"

He answers the question, in the opinion in the negative.

In *Minor v. Happersett, supra,* Chief Justice Waite in speaking for the court said:

"If the right of suffrage is one of the necessary privileges of a citizen of the United States, then the Constitution and laws of Missouri confining it to men are in violation of the Constitution of the United States, as amended; and

consequently void. The direct question is therefore presented whether all citizens are necessarily voters. The Constitution does not define the privileges and immunities of citizens. For that definition we must look elsewhere. In this case we need not determine what they are, but only whether suffrage is necessarily one of them. It certainly is nowhere made so in express terms. *The United States has no voters in the states of its own creation. The elective officers of the United States are all elected directly or indirectly by state voters.* (Italics ours.) The members of the House of Representatives are to be chosen by the people of the states, and the electors in each state must have the qualifications requisite for electors of the most numerous branch of the state Legislature. * * * The amendment did not add to the privileges and immunities of a citizen. It simply furnished an additional guaranty for the protection of such as he already had. No new voters were necessarily made by it. * * * It is clear, therefore, we think, that the Constitution has not added the right of suffrage to the privileges and immunities of citizenship as they existed at the time it was adopted. * * *"

In *United States v. Susan B. Anthony, supra,* Mr. Justice Hunt, sitting on the circuit, said:

"The fourteenth amendment creates and defines citizenship of the United States. It had long been contended, and had been held by many learned authorities and had never been judicially decided to the contrary, that there was no such thing as a citizen of the United States, except as that condition arose from citizenship of some state. No mode existed, it was said, of obtaining a citizenship of the United States, except by first becoming a citizen of some state. This question is now at rest. The fourteenth amendment defines and declares who shall be citizens of the United States, to wit, 'all persons born or naturalized in the United States, and subject to the jurisdiction thereof.' The latter qualification was intended to exclude the children of foreign representatives and the like. With this qualification, every person born in the United States or naturalized is declared to be a citizen of the United States and of the state wherein he resides. After creating and defining citizenship of the United States, the fourteenth amendment provides, that 'no state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States.' This clause

is also intended to be a protection, not to all our rights, but to our rights as citizens of the United States only; that is, to rights existing or belonging to that condition or capacity. The expression, 'citizen of a state,' used in the previous paragraph, is carefully omitted here. In article 4, section 2, subdivision 1, of the Constitution of the United States, it had been already provided that the 'citizen of each state shall be entitled to all privileges and immunities of citizens in the several states.' The rights of citizens of the state and of citizens of the United States are each guarded by these different provisions. That these rights are separate and distinct was held in the *Slaughter-House Cases,* 16 Wall. 36 [21 L. Ed. 394], recently decided by the Supreme Court. The rights of citizens of the state, as such, are under consideration in the fourteenth amendment. They stand as they did before the adoption of the fourteenth amendment, and are fully guaranteed by other provisions. The rights of citizens of the states have been the subject of judicial decision on more than one occasion. *Corfield v. Coryell,* 4 Wash. C. C. 371 [Fed. Cas. No. 3,230]; *Ward v. Maryland,* 12 Wall. 418, 430 [20 L. Ed. 449]; *Paul v. Virginia,* 8 Wall. 168 [19 L. Ed. 357]. These are the fundamental privileges and immunities belonging of right to the citizens of all free government, such as the right of life and liberty, the right to acquire and possess property, to transact business, to pursue happiness in his own manner, subject to such restraint as the government may adjudge to be necessary for the general good. In *Crandall v. Nevada,* 6 Wall. 35, 44 [18 L. Ed. 745], is found a statement of some of the rights of a citizen of the United States, viz., to come to the seat of government to assert any claim he may have upon the government, to transact any business he may have with it, to seek its protection, to share its office, to engage in administering its functions, and to have free access to its seaports, through which all the operations of foreign commerce are conducted, to the subtreasuries, the land offices, the revenue offices, and the courts of justice in the several states. 'Another privilege of a citizen of the United States,' says Mr. Justice Miller, in the *Slaughter-House Cases* [*supra*] 'is to demand the care and protection of the federal government over his life, liberty, and property, when on the high seas or within the jurisdiction of foreign government.' 'The right to peaceably as-

semble and petition for redress of grievances, the privilege of the writ of *habeas corpus*,' he says, 'are rights of the citizens guaranteed by the federal Constitution.' The right of voting, or the privilege of voting, is a right or privilege arising under the Constitution of the state, and not under the Constitution of the United States. * * * 'The United States· rights appertaining to this subject are those: First, under article 1, section 2, subdivision 1, of the United States Constitution, which provides, that electors of 'representatives in Congress shall have the qualifications requisite for electors of the most numerous branch of the state Legislature; and, second, under the fifteenth amendment, which provides that 'the right of citizens of the United States to vote shall not be denied or abridged by the United States, or by any state, on account of race, color, or previous condition of servitude.' If the Legislature of the state of New York should require a higher qualification in a voter for a representative in Congress than is required for a voter for a member of the House of Assembly of the state, this would, I conceive, be a violation of a right belonging to a person as a citizen of the United States. That right is in relation to a federal subject or interest, and is guaranteed by the federal Constitution. The inability of a state to abridge the right of voting on account of race, color, or previous condition of servitude arises from a federal guaranty. Its violation would be the denial of a federal right; that is, a right belonging to the claimant as a citizen of the United States. This right, however, exists by virtue of the fifteenth amendment. If the fifteenth amendment had contained the word 'sex,' the argument of the defendant would have been potent. She would have said that an attempt by a state to deny the right to vote because one is of a particular sex is expressly prohibited by that amendment. The amendment, however, does not contain that word. It is limited to race, color, or previous condition of servitude. The Legislature of the state of New York has seen fit to say that the franchise of voting shall be limited to the male sex. In saying this, there is, in my judgment, no violation of the letter, or of the spirit, of the fourteenth or of the fifteenth amendment. This view is assumed in the second section of the fourteenth amendment, which enacts that if the right to vote for federal officers is denied by any state to any of the male inhabitants of such state, except for crime, the basis of representation of

such state shall be reduced in a proportion specified. Not only does this section assume that the right of male inhabitants to vote was the especial object of its protection, but it assumes and admits the right of a state, notwithstanding the existence of that clause under which the defendant claims to the contrary, to deny to classes or portions of the male inhabitants the right to vote which is allowed to other male inhabitants. The regulation of the suffrage is thereby conceded to the states as a state's right. The case of *Bradwell v. Illinois,* 16 Wall. 130 [2 L. Ed. 442], decided at the recent term of the Supreme Court, sustains both of the positions above put forth, viz., first, that the rights referred to in the fourteenth amendment are those belonging to a person as a citizen of the United States, and not as a citizen of a state. * * *"

See, also, *United States v. Quinn, supra; United States v. Crosby,* 1 Hughes, 448, Fed. Cas. No. 14,893.

In *Minor v. Happersett, supra,* it is also said:

"And still again, after the adoption of the fourteenth amendment, it was deemed necessary to adopt a fifteenth. * * * The fourteenth amendment had already provided that no state should make or enforce any law which should abridge the privileges or immunities of citizens of the United States. If suffrage was one of these privileges or immunities, why amend the Constitution to prevent its being denied on account of race, etc.? Nothing is more evident than that the greater must include the less, and if all were already protected, why go through with the form of amending the Constitution to protect a part?"

In Brannon's work on the fourteenth amendment, at page 77, it is said:

"If, therefore, state Constitution or law makes color a qualification of voting, it violates a privilege or immunity given the colored man, violates amendment 15; and the state officers of election would be bound to ignore the state law, as it of its own force, without legislation, strikes the word 'white' from the state Constitution, and Congress could enact a law granting the voter his vote in such case and punishing its denial. It would be a denial of a right given by amendment 15; but, as properly held in *United States v. Reese,* it would not come under amendment 14. It is not

a privilege under amendment 14. It does not need that amendment for its maintenance. If the state definition of suffrage happen to deny it to a colored man from any substantial ground, not merely colorable, other than race, color, or previous condition of servitude, it violates no privilege or immunity given by the federal Constitution."

The case of *United States v. Reese, supra,* announces this doctrine without limitation or equivocation.

Mr. Justice Miller, in his Lectures on the Constitution of the United States (Bancroft-Davis Ed., p. 661) says:

"The right of suffrage was not necessarily one of the privileges or immunities of citizenship before the adoption of the fourteenth amendment. That amendment does not add to these privileges and immunities. * * * Neither the Constitution nor the fourteenth amendment made all citizens voters."

In 2 Willoughby's work on the Constitution, p. 886, it is said:

"The requirement as to equal protection of the law does not operate to prevent the states from restricting the enjoyment of political privileges to such classes of their citizens as they may see fit."

In volume 1, of the same, at page 543, it is said:

"This amendment thus leaves it within the constitutional power of the states to place such restrictions as they choose upon the exercise of the suffrage within their limit, but subject to a reduction of the number of representatives to which they are entitled in Congress to the extent to which the right to vote is denied to adult male inhabitants, citizens of the United States. The fifteenth amendment, adopted two years later, places the absolute prohibition upon the states that 'the right of citizens of the United States to vote shall not be denied or abridged * * * on account of race, color, or previous condition of servitude.'"

It seems to be clear, therefore, that limitations upon suffrage by the states, no matter in what form enacted, asserted or practiced, were not within the purview of the fourteenth amendment.

In *Strauder v. State of West Virginia,* 100 U. S. 303, 25 L. Ed. 664, it is said:

"The fourteenth amendment makes no attempt to enumerate the rights it was designed to protect. It speaks in general terms, and those are as comprehensive as possible. Its language is prohibitory; but every prohibition implies the existence of rights and immunities, prominent among which is an immunity from inequality of legal protection, either for life, liberty, or property. Any state action that denies this immunity to a colored man is in conflict with the Constitution."

The exercise of suffrage is neither an immunity of federal nor of state citizenship; it being merely a privilege and not a right. In the opinion it is also said:

"The right to a trial by jury is guaranteed to every citizen of West Virginia by the Constitution of that state, and the constitution of juries is a very essential part of the protection such a mode of trial is intended to secure. The very idea of a jury is a body of men composed of the peers or equals of the person whose rights it is selected or summoned to determine; that is, of his neighbors, fellows, associates, persons having the same legal status in society as that which he holds. Blackstone, in his Commentaries, says: 'The right of trial by jury, or the country, is a trial by the peers of every Englishman, and is the grand bulwark of his liberties, and is secured to him by the Great Charter.' "

The right of trial by jury is a fundamental right relative to life, liberty, and property, and an immunity of citizenship, and for that reason it was held that it was embraced in the protection of the fourteenth amendment. Of course a state statute, providing a qualification for jurors in violation of the provisions of the fourteenth amendment, must, to that extent, fall. And if the state qualification as to suffrage does not fall within the limitations of the fifteenth amendment, such qualifications must stand.

2. In *United States v. Reese, supra,* in an opinion by Chief Justice Waite, it is said:

"The fifteenth amendment does not confer the right of suffrage upon any one. It prevents the states, or the United States, however, from giving preferences, in this particular, to one citizen of the United States over another, on account

of race, color, or previous condition of servitude. Before its adoption, this could be done. It was as much within the power of a state to exclude citizens of the United States from voting on account of race, etc., as it was on account of age, property, or education. Now it is not."

In *United States v. Cruikshank, supra,* it was declared that the right of suffrage was neither a necessary attribute nor incident to national citizenship.

In *Williams v. Mississippi,* 170 U. S. 214, 18 Sup. Ct. 583, 42 L. Ed. 1012, Mr. Justice McKenna, delivering the opinion, said:

"This comment is not applicable to the Constitntion of Mississippi and its statutes. They do not on their face discriminate between the races and it has not been shown that their actual administration was evil; only that evil was possible under them."

In *Pope v. Williams, supra,* Mr. Justice Peckham, in delivering the opinion of the court, held that the Maryland law on suffrage did not, on its face, discriminate within the meaning of either the fourteenth or fifteenth amendments to the Constitution. In the opinion it is said:

"* * * The privilege to vote in a state is within the jurisdiction of the state itself, to be exercised as the state may direct, and upon such terms as to it may seem proper, provided, of course, no discrimination is made between individuals in violation of the federal Constitution. * * * The question whether the conditions prescribed by the state might be regarded by others as reasonable or unreasonable is not a federal one."

Mr. Justice Hunt, in the case of *United States v. Anthony, supra,* said:

"The qualifications are different in the different states. Citizenship, age, sex, residence are variously required in the different states, or may be so. If the right belongs to any particular person, it is because such person is entitled to it by the laws of the state where he offers to exercise it, and not because of citizenship of the United States. If the state of New York should provide that no person should vote until he had reached the age of 30 years, or after he

had reached the age of 50, or that no person having gray hair, or who had not the use of all his limbs, should be entitled to vote, I do not see how it could be held to be a violation of any right derived or held under the Constitution of the United States.   We might say that such regulations were unjust, tyrannical, unfit for the regulation of an intelligent state; but if rights of a citizen are thereby violated, they are of that fundamental class, derived from his position as a citizen of the state, and not those limited rights belonging to him as a citizen of the United States. * * *"

Section 4a is fair on its face, not denying or abridging the right of suffrage on account of race, color, or previous condition of servitude.   The provision being fair and valid on its face, courts are not permitted to look beyond its express provisions and inquire into the motives of the framers in order to find a ground for nullifying same. *Ex parte McCardle,* 7 Wall. (74 U. S.) 506, 19 L. Ed. 264.

Suffrage in the various states, at the time of the adoption of the federal Constitution, was restricted or qualified as follows:

Connecticut: To freemen up to 1818.   By the Constitution of 1818 it is further qualified so as to be restricted to white persons, and to require the elector to have a "freehold estate of the yearly value of seven dollars in this state; or having been enrolled in the militia, shall have performed military duty therein for the term of one year next preceding the time he shall offer himself for admission, or being liable thereto shall have been, by authority of law, excused therefrom; or shall have paid a state tax within the year next preceding the time he shall present himself for such admission; and shall sustain a good moral character." In October, 1897, by amendment to the Constitution it was provided that every person shall be able to read in the English language any article of the Constitution, or any section of the statutes of that state before being admitted an elector.

Delaware: To freemen up to 1792. By the Constitution of 1792 suffrage was limited to every white man of the

age of 21 years, having resided in the state two years next before the election, and within that time paid a state or county tax, which shall have been assessed at least six months before the election. It was further provided that *the sons of persons so qualified shall, between the ages of 21 and 22 years, be entitled to vote, although they shall not have paid taxes.* By the Constitution of 1897 suffrage was extended to every male citizen of that state of the age of twenty-one years, possessing certain qualifications as to residence and registration, with a proviso "that no person who shall attain the age of twenty-one years 'after the first of January, in the year of our Lord, nineteen hundred, or after that date shall become a citizen of the United States, shall have the right to vote unless he shall be able to read this Constitution in the English language, and write his name." (Italics ours.)

Georgia: To "all male white inhabitants, of the age of twenty-one years ,and possessed in his own right of ten pounds value, and liable to pay tax in this state, or being of any mechanic trade." By the Constitution of 1798 suffrage was limited to such white persons as "shall have attained the age of twenty-one years, and have paid all taxes which have been required of them and which they have had an opportunity of paying, agreeably to law, for the year preceding the election, and shall have resided six months within the county."

Maryland: By Constitution of 1776 to all freemen having property above the value of £30, and having resided one whole year next preceding the election in the county in which they offer to vote. In 1810, by amendment, it was restricted to white persons. *Hughes v. Jackson,* 12 Md. 450.

Massachusetts: To those having a freehold estate within the commonwealth. By amendment, adopted in 1820, it was restricted to every male citizen of twenty-one years of age, with certain exceptions as to paupers, etc., and who shall have paid, by himself, or his parent, master, or guardian, any state

or county tax, in any town or district of such commonwealth. By amendment, adopted in 1857, suffrage was further restricted so as to exclude those not being able to read the Constitution in the English language and write their names, with the proviso that such provision would not apply to any person prevented by physical disability from complying therewith, nor any person who then had the right to vote, or to those who should be 60 years of age or upwards at the time the amendment took effect. By amendment, adopted in 1859, persons of foreign birth were excluded unless they had resided within the jurisdiction of the United States for two years subsequent to their naturalization, with a provision that at the time of the adoption of the amendment it should not affect his rights, and that it should not affect the rights of any child of a citizen of the United States, born during the temporary absence of the parent therefrom.

New Hampshire: To freeholders paying a poll tax, including all freemen. By the Constitution of 1902 it is provided that no person shall have the right to vote who shall not be able to read the Constitution in the English language, provided that such provision shall not apply to any person prevented by a physical disability, nor to any person who shall be 60 years of age or upwards on the 1st day of January, 1904.

New Jersey: By Constitution of 1776 to all male inhabitants of full age who are worth £50, and have resided within the county in which they claim a vote for twelve months preceding the election. By Constitution of 1844 to every male person of full age.

New York: By the Constitution of 1777 to all freeholders possessed of a freehold estate of the value of £20, within the county, or having rented a tenement therein of the yearly value of 40 shillings, and having been rated and actually paid taxes in said state, with a proviso that all who are freemen then of the city of Albany, or a freeman

Vol. 38—40

of the city of New York, or who was made so on or before the 14th day of October, 1775, who shall be actually and usually residing in the said cities, shall be entitled to vote for representatives in assembly, within his place of residence. This was the rule until the adoption of the Constitution in 1846, which provided that every free male citizen of the age of 21 years, possessing certain qualifications as to his residence, should be permitted to vote, with the proviso that "no man of color, unless he shall have been for three years a citizen of the state, and for one year next preceding any election shall have been seised and possessed of a freehold estate of the value of two hundred and fifty dollars, over and above all debts and incumbrances charged thereon, and shall have been actually rated and paid a tax thereon, shall be entitled to vote at such election. And no person of color shall be subject to direct taxation unless he shall be seised and possessed of such real estate as aforesaid.

North Carolina: By the Constitution of 1776 (sections 9 and 10), to freemen of the age of 21 years possessed of a freehold estate within the county of fifty acres, and shall have paid public taxes. On July 11, 1835, by amendment (section 3, subdiv. 2) it was provided that "all freemen of the age of twenty-one years (except as hereinafter declared), who have been inhabitants of any one district within the state twelve months immediately preceding the day of any election, and possessed of a freehold within the same district of fifty acres of land, for six months next before and at the day of election, shall be entitled to vote for a member of the Senate" (Subdivision 2). "No free negro, free mulatto, or free person of mixed blood, descended from negro ancestors to the fourth generation inclusive (though one ancestor of each generation may have been a white person), shall vote for members of the Senate or House of Commons" (subdivision 3). Under this provision, even after the Constitution of 1835, free negroes were permitted to vote for all officers except members of the Senate or House of Commons. On

December 11, 1856, the Constitution was amended so as to restrict suffrage to "every white man of the age of twenty-one years, who shall have paid public taxes." Obviously free negroes were entitled to vote in North Carolina within the meaning of section 4a until December 11, 1856.

Pennsylvania: By the Constitution of 1776 (Declaration of Rights, section 7) it is provided "* * * that all freemen having a sufficient evident common interest with, and attachment to the community, have a right to elect officers, or to be elected into office." By the Constitution of 1790 (section 1, article 3) it provided:

"* * * Every freeman of the age of twenty-one years, having resided in the state two years next before the election, and within that time paid a state or county tax, which shall have been assessed at least six months before the election, shall enjoy the rights of an elector: Provided, *that the sons of persons qualified as aforesaid, between the ages of twenty-one, and twenty-two years, shall be entitled to vote, although they shall not have paid taxes.*" (Italics ours.) In 1838 suffrage was restricted to white freemen, who, within two years prior to the election, had paid a state or county tax, which had been assessed at least ten days before the election, with the further proviso that "a citizen of the United States, who had previously been a qualified voter of this state and removed therefrom and returned and who shall have resided in the election district and paid taxes as aforesaid, shall be entitled to vote after residing in the state six months: Provided, that white freemen, citizens of the United States, between the ages of twenty-one and twenty-two years, and having resided in the state one year and the election district ten days as aforesaid, shall be entitled to vote, although they shall not have paid taxes."

Rhode Island: To freemen. By the Constitution of 1842 to such persons as are "possessed in his own right of real estate in such town or city of the value of one hundred

and thirty-four dollars over and above all incumbrances, or which shall rent for seven dollars per annum over and above any rent reserved or the interest of any incumbrances thereon, being an estate in fee simple, fee tail, for the life of any person, or an estate in reversion or remainder, which qualifies no other person to vote, the conveyance of which estate, if by deed shall have been recorded at least ninety days, shall thereafter have a right to vote in the election of all civil officers and all questions in all legal town or ward meetings. so long as he continues so qualified. And if any person hereinbefore described shall own any such estate within this state out of the town or city in which he resides, he shall have a right to vote in the election of all general officers and members of the General Assembly in the town or city in which he shall have had his residence and home for the term of six months next preceding the election, upon producing a certificate from the clerk of the town or city in which his estate lies, bearing date within ten days of the time of his voting, setting forth that such person has a sufficient estate therein to qualify him as a voter; and that the deed if any has been recorded ninety days."

South Carolina: By Constitution of 1790 to every free white man over the age of 21 years, possessing certain other qualifications as to his residence, who hath a freehold estate of 50 acres of land or a town lot, of which he hath been legally seised and possessed at least six months before such election, or, not having such freehold or town lot, hath been a resident in the election district in which he offers to give his vote six months before the said election, and hath paid a tax the preceding year of three shillings sterling toward the support of the government. This continued in force until 1866.

Virginia: By the Constitution of 1776 to all men having sufficient evidence of permanent common interest with and attachment to the Constitution. By the Constitution of 1830 it was restricted to every white male citizen having qualifications as to residence and age "possessed, or whose tenant

for years, at will or at sufferance, is possessed, of an estate or freehold in land of the value of twenty-five dollars, and so assessed to be if any assessment thereof be required by law; and every such citizen, being possessed as tenant in common, joint tenant or parcener of an interest in or share of land, * * * being of the value of twenty-five dollars, and so assessed to be if any assessment thereof be required by law; and every such citizen, being entitled to a reversion or vested remainder in fee, expectant on an estate for life or lives, in land of the value of fifty dollars, and, so assessed to be if any assessment thereof be required by law (each and every such citizen, unless his title shall have come to him by descent, devise, marriage or marriage settlement, having been so possessed or entitled for six months); and every such citizen who shall own and be himself in actual occupation of a leasehold estate, with the evidence of title recorded two months before he shall offer to vote, of a term originally not less than five years, of the annual value or rent of twenty dollars; and every such citizen who for twelve months next preceding has been a housekeeper and head of a family within the county, city, town, borough or election district where he may offer to vote, and shall have been assessed with a part of the revenue of the commonwealth within the preceding year, and actually paid the same—and no other persons—shall be qualified to vote. * * *" This provision continued in force until in 1850 when, by the Constitution adopted in that year, it was restricted to every white male citizen, with certain prescribed qualifications as to residence and age.

We advert to the following states in addition to the original thirteen:

In Maine and Michigan from the time of their admission into the Union (Maine, 1819. and Michigan, 1850) to January 1, 1866, free negroes were eligible voters. At different periods free negroes were eligible voters in the following states: Kentucky, Constitution 1792, section 1, article 3 (in force until 1799). Tennessee, Constitution 1796, article

3, section 1 (in force until 1835). Texas, Constitution 1836, article 6, section 11, to every citizen possessing certain qualifications as to age and residence. See the Constitution of 1845, article 3, section 2, to same effect. From the time that Texas obtained her independence from Mexico to January 1, 1866, free negroes were eligible voters under the Constitution of Texas.

Mr. Justice McLean, in *Scott v. Sanford*, 19 How. 537, 15 L. Ed. 755, said:

"And while I admit the government was not made especially for the colored race, yet many of them were citizens of the New England states, and exercised the rights of suffrage when the Constitution was adopted."

Mr. Justice Curtis, in the same opinion, said:

"At the time of the ratification of the Articles of Confederation, all free native born inhabitants of the states of New Hampshire, Massachusetts, New York, New Jersey, and North Carolina, though descended from African slaves, were not only citizens of those states, but such of them as had the other necessary qualifications possessed the franchise of electors, on equal terms with other citizens."

Free negroes were entitled to vote in the following states, of the original thirteen states up to the years, as indicated: Connecticut, 1818; Delaware, 1792; Maryland, 1810; Massachusetts, 1866; New Hampshire, 1866; New Jersey, 1866; New York, 1866; North Carolina, 1856; Pennsylvania, 1838; Rhode Island, 1866; Virginia, 1830.

In *Atwater v. Hassett et al., supra,* it is said:

"In practically every state of the Union, on January 1, 1866, persons were disqualified from voting who had been convicted of infamous crimes, unless such disqualification had been removed, etc. In addition, an alien residing in this country on January 1, 1866, neither having become a naturalized citizen nor having declared his intention to become a citizen of the United States, was not entitled to vote in any of the states. At that time there were many foreign governments where the right of suffrage did not exist in any way, and in nearly all others, where it existed at that time, it was with many limitations. Such alien, residing in the United

States on January 1, 1866, neither being entitled to vote in the place of his residence nor under any organized government where he had previously resided or been a citizen of, and his descendants, would also be subject to this educational qualification, coming within the excluded class as of the date of January 1, 1866. Furthermore, the Blanket Indians on January 1, 1866, had no organized form of government under which they might exercise the right of suffrage. The Cherokee, Chickasaws, Choctaws, Creeks, Osages and Seminoles had such a government, and seem to have been the only tribes, the remnants of which now remain in this state, which had such a government. Again, many states have similar existing suffrage limitations where the same have been enforced and recognized in the election of state officers and members of Congress; Const. Ala. 1901, sec. 180, pars, 1, 2; Const. La. 1898, art. 187, sec. 5; Const. N. C. 1876, art. 6, sec. 1; Const. Va. 1902, sec. 19, pars. 1, 2 (Code 1904, p. ccxii)."

The plaintiff in error (and none of his ancestors) neither being entitled to vote under any organized form of government prior to January 1, 1866, nor he, on January 1, 1866, being a nonresident alien, and as such came to the United States, and became a citizen by naturalization, to say that said amendment denies or abridges his right to vote "on account of race, color, or previous condition of servitude" is as unfounded as it would be to say that a property qualification denies or abridges such right on account of previous condition of servitude on the ground that if he had not been held as a slave he would have been able to acquire property, since the slave could not acquire property any more than he could vote.

The plaintiff in error, if he was entitled to vote under any organized form of government prior to January 1, 1866, or if any of his ancestors, to the remotest degree, were entitled, prior to that date, to vote under any organized form of government, even though it was under an organized form of government existing in Africa, prior to the time that his ancestors may have been transported to the American shores

and placed in bondage, is entitled to vote under section 4a, article 3, of the Constitution of this state, if he possesses the other qualifications, such as residence, etc., and has complied with any registration requirement.

In *Atwater v. Hassett et al., supra,* it is said:

"It is a matter of common knowledge that the population of this state is cosmopolitan, embracing people of every creed and race from practically every state in the Union. All of those persons who on January 1, 1866, or at any time prior thereto, were entitled to vote under any form of government or state or territory of this Union, or who, at that time residing in some foreign nation, afterwards came to the United States, and by naturalization became citizens of the United States, and their lineal descendants, regardless of race or previous condition of servitude, are permitted to vote at the elections in this state, without complying with the educational requirements of said provision. That is a classification based upon a reason; that is, that any person who was entitled to vote under a form of government on or prior to said date is still presumed to be qualified to exercise such right, and the presumption follows as to his offspring; that is, that the virtue and intelligence of the ancestors will be imputed to his descendants, just as the iniquity of the fathers may be visited upon the children unto the third and fourth generation. But as to those who were not entitled to vote under any form of government on said date, or at any prior time, and their descendants, there is no presumption in favor of their qualification, and the burden is upon them to show themselves qualified. This does not apply to any one race, but to every race that falls within this qualification."

Qualifications based on education, property holdings, good moral character, payment of taxes, military service, the qualification of the father, and "those having sufficient evidence of permanent common interest with an attachment to the Constitution," and on account of being engaged in a particular trade, have been recognized without question as within the powers of the several states to impose. Every commonwealth is necessarily deeply concerned about the character of the men to whom shall be granted the right or privilege of suf-

frage.  It is by its exercise that governmental agencies are created and efficiently administered.  Men exercising this right should not only be loyal to our institutions, but also understand and sympathize with the nature and functions of the government.  It is upon this theory, which has been long acquiesced in and acted upon in the American commonwealths, that suffrage has been by them limited, subject only to the restrictions of the fifteenth amendment of the federal Constitution.

By the Constitutions of Delaware in 1792, and Pennsylvania in 1790, as has heretofore been shown, it was provided that the sons of persons so qualified to vote, which consisted of residence and the payment of state or county taxes, assessed against them at least six months before the election, should, between the ages of 21 and 22, be entitled to vote, although the sons had not paid such taxes.  This is a practical demonstration and exercise in this New World, within fourteen years after the signing of the Declaration of Independence, and one year after the framing of the federal Constitution, of the power of the state to cause the capacity and qualification of the father to be imputed to the son.

The New Hampshire Constitution of 1903 imputed such qualification to those over 60 years of age or upwards on the 1st day of January, 1904.

By the Constitution of Massachusetts practically the same exemption provision is made to apply to those over 60 years of age at the time the amendment was adopted.  Such is practically the same in the Constitution of Maine, by amendment 29, adopted in 1892.

In Stimson's Federal and State Constitutions of the United States, at page 224, referring to what is known as "grandfather clause," it is said:

"This principle recently adopted in the state Constitutions, mainly in Southern states, but also in some Northern states, operates as an exception to the property and educational qualifications.  Thus, in New Hampshire, all persons who had the

right to vote at the time of the adoption of the New Constitution, 1903, or were sixty years old January 1, 1904. So in Delaware educational qualification only applies to persons who become twenty-one years old or are naturalized as United States citizens after January 1, 1900."

The number of free colored persons returned at the census of 1790 as residing in the United States was 59,527. The return at said census was 694,280 slaves. The free colored persons were distributed among the several states and territories as follows: Vermont, 281; New Hampshire, 630; Maine, 538; Massachusetts, 5,463; Rhode Island, 3,407; Connecticut, 2,808; New York, 4,654; New Jersey, 2,762; Pennsylvania, 6,537; Delaware, 3,899; Maryland, 8,043; Virginia, 12,866; Kentucky, 114; North Carolina, 4,975; South Carolina, 1,801; Georgia, 398; Southwest Territory, 361; Northwest Territory, none. The slaves were distributed among the several states and territories, at said time, as follows: Vermont, none; New Hampshire, 158; Maine, none; Massachusetts, none; Rhode Island, 948; Connecticut, 2,764; New Jersey, 11,432; Pennsylvania, 3,757; Delaware, 8,287; Maryland, 103,036; Virginia, 292,627; Kentucky, 12,430; North Carolina, 100,-572; South Carolina, 107,094; Georgia, 29,264; Southwest Territory, 3,417; Northwest Territory, none. See A Century of Population Growth in the United States, 1790-1900, p. 47, published by Government Printing Office, Washington, D. C., 1909. In 1790 in all of these states and territories free colored people and freemen were entitled to vote, provided they had the other requirements as to residence, etc., except Georgia and South Carolina. The number of free colored people and slaves returned at the census of 1800 to ·1860 inclusive were as follows: In 1800, free colored 108,-435, and slaves 893,602; in 1810, free colored 186,446, and slaves 1,191,362; in 1820, free colored 223,634, and slaves 1,538,022; in 1830, free colored 319,599, and slaves 2,009,-043; in 1840, free colored 386,293, and slaves 2,847,355; in

1850, free colored 434,495, and slaves 3,204,313; in 1860, free colored 488,070, and slaves 3,953,760.

The following table given at the census report for 1870, will be here inserted as to the free colored persons in each state as returned at each census from 1710 to 1860, inclusive:

| States and Territories. | Free Colored. | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 1860 | 1850 | 1840 | 1830 | 1820 | 1810 | 1800 | 1790 |
| Total of the United States | 488,070 | 434,495 | 386,293 | 319,599 | 233,634 | 186,446 | 108,435 | 59,527 |
| Total of the States | 476,748 | 424,390 | 377,932 | 313,447 | 229,586 | 183,897 | 107,652 | 59,527 |
| Alabama | 2,690 | 2,265 | 2,039 | 1,572 | 571 | | | |
| Arkansas | 144 | 608 | 465 | 141 | 59 | | | |
| California | 4,086 | 962 | | | | | | |
| Connecticut | 8,627 | 7,693 | 8,105 | 8,047 | 7,870 | 6,453 | 5,330 | 2,808 |
| Delaware | 19,829 | 18,073 | 16,919 | 15,958 | 13,136 | 13,136 | 8,268 | 3,899 |
| Florida | 932 | 932 | 817 | 844 | | | | |
| Georgia | 3,500 | 2,931 | 2,753 | 2,486 | 1,763 | 1,801 | 1,019 | 309 |
| Illinois | 7,628 | 5,436 | 3,598 | 1,637 | 457 | 613 | | |
| Indiana | 11,428 | 11,262 | 7,165 | 3,629 | 1,280 | 393 | 163 | |
| Iowa | 1,069 | 333 | 172 | | | | | |
| Kansas | 625 | | | | | | | |
| Kentucky | 10,684 | 10,011 | 7,317 | 4,917 | 2,759 | 1,713 | 739 | 114 |
| Louisiana | 18,647 | 17,462 | 25,502 | 16,710 | 10,476 | 7,585 | | |
| Maine | 1,327 | 1,356 | 1,355 | 1,190 | 929 | 969 | 818 | 538 |
| Maryland | 83,942 | 74,723 | 62,078 | 52,938 | 39,730 | 33,927 | 19,587 | 8,043 |
| Massachusetts | 9,602 | 9,064 | 8,669 | 7,048 | 6,740 | 6,737 | 6,452 | 5,463 |
| Michigan | 6,799 | 2,583 | 707 | 261 | 174 | 120 | | |
| Minnesota | 259 | 39 | | | | | | |
| Mississippi | 773 | 930 | 1,366 | 519 | 458 | 340 | 182 | |
| Missouri | 3,572 | 2,618 | 1,574 | 569 | 347 | 607 | | |
| Nebraska | 67 | | | | | | | |
| Nevada | 45 | | | | | | | |
| New Hampshire | 495 | 520 | 537 | 604 | 786 | 970 | 852 | 630 |
| New Jersey | 25,318 | 23,810 | 21,044 | 18,303 | 12,460 | 7,843 | 4,402 | 2,762 |
| New York | 49,005 | 49,069 | 50,027 | 44,870 | 29,279 | 25,333 | 10,417 | 4,654 |
| North Carolina | 30,463 | 27,463 | 22,732 | 19,543 | 14,712 | 10,266 | 7,043 | 4,975 |
| Ohio | 36,673 | 25,279 | 17,342 | 9,568 | 4,723 | 1,899 | 337 | |
| Oregon | 128 | 207 | | | | | | |
| Pennsylvania | 56,949 | 53,626 | 47,854 | 37,930 | 30,202 | 22,492 | 14,564 | 6,537 |
| Rhode Island | 3,952 | 3,670 | 3,238 | 3,561 | 3,554 | 3,609 | 3,304 | 3,407 |
| South Carolina | 9,914 | 8,960 | 8,276 | 7,921 | 6,826 | 4,554 | 3,185 | 1,801 |
| Tennessee | 7,300 | 6,422 | 5,524 | 4,555 | 2,737 | 1,317 | 309 | 361 |
| Texas | 355 | 397 | | | | | | |
| Vermont | 709 | 718 | 730 | 881 | 903 | 750 | 557 | 271 |
| Virginia | 58,042 | 54,333 | 49,842 | 47,348 | 36,883 | 30,570 | 20,124 | 12,866 |
| Wisconsin | 1,171 | 635 | 185 | | | | | |

The number of colored persons returned at the census of 1870, 1880, and 1890, as having been born abroad is as follows: 1870, 9,645; 1880, 14,017; 1890, 19,979. These colored persons, when naturalized as citizens of the United States,

are entitled to vote under section 4a, article 3, of the Constitution of this state, provided they possess the requisite qualifications as to residence, etc.   Such are also exempt from the educational test imposed by said section 4a.   So any negro who, on January 1, 1866, or at any time prior thereto, resided in some foreign country, and since then has come to the United States and become a naturalized citizen, is entitled to be registered as an elector in this state, and must be allowed to vote if he possesses the other required qualifications as to residence, etc., without complying with the educational test of section 4a, and this, though he may have been at some time a slave in such foreign country.

In *Atwater v. Hassett et al., supra,* it is said:

"All of those persons who, on January 1, 1866, or at any time prior thereto, were entitled to vote under any form of government or state or territory of this Union, or who at that time residing in some foreign nation, afterwards came to the United States and by naturalization became citizens of the United States, and their lineal descendants, regardless of race or previous condition of servitude, are permitted to vote at the elections in this state, without complying with the educational requirements of said provision."

This exemption also applies to the descendants of such naturalized negroes.

Further, it is a matter of such common or historical knowledge that this court takes cognizance of the fact that a great many slaves were, by their masters, emancipated.   Such slaves thus becoming freemen, if they took up their residence in a state where suffrage was extended to freemen regardless of race or color (and it appears that such was the case in a great many of the states), and they possessed the other required qualifications as to residence, or good moral character, or having paid taxes or owning certain amount of property, etc., they were entitled to vote.   Under the provisions of section 4a, article 3, they and their descendants, regardless of the fact that they may have been slaves, would come within the terms of its exemption.   Their descendants, al-

though subsequently becoming slaves, would also come within the terms of this exemption. Such persons now residing in Oklahoma, although they may be black and of the negro race and may have been slaves, come within the exemption of said section 4a, and are entitled to vote without complying with the educational qualification or test. Again, as disclosed by the world's history, slavery has not been confined solely to the negro race. The Jew, Greek, Roman, and Anglo-Saxon, too, have felt the yoke.

Neither can it be fairly said that the provision under consideration upon its face abridges or restricts the right of suffrage "on account of race, color, or previous condition of servitude," nor can it be successfully contended that such is the reasonable effect to such an extent as to abridge or deny the privilege of suffrage, or to discriminate relative thereto "on account of race, color, or previous condition of servitude." It is not only a matter of common knowledge, but it is shown by records, of which we have judicial knowledge, as was said by Mr. Justice Curtis in the Dred Scott case, that from the time of the adoption of the Articles of the Confederation free negroes resided in every colony and in every state and territory of this Republic. It appears that in a great many of these states—in some of them from the time of the adoption of the federal Constitution to January 1, 1866, and in others at intervals—free negroes were permitted to vote. Under this provision every negro that lived under an organized form of government in Africa or any other country, where he was eligible and entitled to vote under the then existing form of government, although he may have afterwards been brought to the American shores and placed in bondage, yet his descendants, to the remotest degree, come within the terms of this exemption, and if they comply with the other required qualifications as to residence and registration, where such is required by the statutes of this state, to wit, cities of the first class, are entitled to vote, notwithstanding the fact that they could not read or write any

provision of the Constitution of this state. Section 4a, article 3, applies to every race equally. It is not for courts to determine whether this is wise or unwise. That was for the state of Oklahoma to determine in the exercise of its power of sovereignty. In exercising such power, not having abridged or denied the right of suffrage of the plaintiff in error "on account of race, color, or previous condition of servitude," no violation of the federal Constitution arises.

In this state compulsory attendance upon a public or private school, unless other means of education are provided, for a fixed term, is required. Section 7930, Rev. Laws 1910. Also provision is made for furnishing free school books to children. Section 7933, Rev. Laws 1910. Compulsory requirement of attendance upon the public schools or other schools, unless other means of education are provided, to all the children of the state, who are sound in mind and body, between the ages of eight and sixteen years, for at least three months of each year, is provided for by section 4, article 13, of the Constitution. Section 308, Williams' Ann. Const. Okla.

The obvious purpose of the sovereign power of this state to provide that its governmental agencies should be directed and controlled by the forces of intelligence is evidenced by the laws and statutes of this state. The adoption of section 4a, imposing the educational qualification with the exemptions thereunder provided, is a continuance of such purpose, at the same time granting the exemption without discrimination as to any class "on account of race, color, or previous condition of servitude." Section 4a applies to the descendant of a citizen of Rhode Island without the exemption, where the ancestor did not own property. Said amendment, without any exemption, applies to the descendant of a citizen of Vermont because he had been convicted of a felony or other infamous crime; to the descendants of a citizen of Connecticut because he did not "sustain a good moral character"; to the descendants of a citizen of Massachuetts because he could not read and write any provision of the Constitution in the English

language; to the descendants of a citizen of Georgia who was not possessed in his own right of £10 value, and "liable to pay tax in this state or being of the mechanic's trade"— unless the ancestors of such citizen of Rhode Island, Vermont, Massachusetts, Connecticut, or Georgia were entitled to vote under some form of government other than that of such state. This educational qualification, without exemption, applies equally to and restricts the right of suffrage to descendants of citizens of practically all the states, because, as has heretofore been made evident, the qualifications to vote in the several states of this Union, prior to January 1, 1866, were as varied as the colors on Joseph's coat.

This court takes judicial notice of the history of the nation and the state. The fact that January 1, 1866, was a date only about three years following the emancipation of the negroes does not establish that this constitutional amendment under consideration, on its face or in its necessary effect, was intended to and does deny and abridge the right of suffrage against the negro on account of race, color, or previous condition of servitude. The fixing of this date by the sovereign power of this state as that on which and prior to which the qualifications of ancestors to the remotest degree to vote were to be determined, does not show, or establish, the denial or abridging of the right of suffrage on account of race, color, or previous condition of servitude. If January 1, 1872, had been fixed as such date, no more nor less significance would have been indicated, except that a longer line of ancestral years would have existed; for neither the adoption of the fourteenth amendment nor of the fifteenth amendment granted the right of suffrage.

Whilst a sovereign state is not required to give a reason for its granting or withholding the privileges of suffrage, provided it does not deny or abridge the same "on account of race, color, or previous condition of servitude," yet there are many obvious reasons why it may be fairly assumed that one whose ancestors in former times having taken a part in the

management and conduct of governmental affairs by the exercise of the right of suffrage is better qualified to take part in the conduct of governmental affairs, though it be he cannot read or write, than one who can read and write, but whose ancestors at no previous time had taken any part in the framework or the conduct, the preservation or the management, of governmental affairs by means of the exercise of the right of suffrage. Can it be said that an assumption that the descendants of ancestors who were voters, thereby participating in governmental affairs, and necessarily having given thought and devotion to matters of public concern, have not, to a great extent, inherited a love of government and of country, and a capacity for the participation in such affairs? That a large majority of the men who wrung Magna Charta, the great charter of English rights, from King John, could not read or write is a fact. Their participation in the affairs of government necessitated the study of their rights and their remedies. This caused them to have knowledge of matters and things essential to the rights of a free people. They were thus rendered in every way competent to exercise the right of suffrage. Is it not to be presumed that such men transmitted such virtues and such intelligence and such patriotism to their descendants? It has been the custom of all governments to give bounties and grants in the way of property and lands, not only to the soldiers who fought in the common defense, but also to their wives, children, and descendants. This was done out of recognition of a moral obligation or gratitude to those who fought for its preservation. In the folc-gemote only the warriors were entitled to participate, and among the Indian tribes only the warriors were permitted to sit in the council house or around the council fires. Obviously the exemption of soldiers in Connecticut on account of the rendition of military service from the operation of the general suffrage qualification was based, not only upon reason, but also upon precedent and practice. The granting of the exemption from the general educational qualification under the terms of the amendment here under

consideration is not caused by gratitude or appreciation on the part of the commonwealth for services rendered in battle or in military enlistment, but for a higher governmental reason; that is, that the descendants of those who had been identified with the making, developing, and preserving of government, not having those qualifications which exist by the acquiring of the ability to read and write, are recognized as acquiring and inheriting these qualifications from their ancestors.

Would it be contended, because Maine, Massachusetts, and New Hampshire provided that all persons over the age of sixty years should be exempted from the educational qualification, if it turned out that a greater portion of the white race were exempted from the operation of that educational qualification than of other races residing in such states, that that amendment abridged or denied the right of suffrage, on account of race, color, or previous condition of servitude? Evidently no such contention could be successfully made. This constitutional amendment permits every race to run back in the line of its ancestors to its beginning, and if this plaintiff in error in so doing can connect himself with any ancestor that was entitled to vote under any organized form of government, he is entitled to this exemption. It is the duty of courts, if they can, to sustain all enactments of the people, whether it be purely legislative or organic provisions.

3. Section 3 of the Enabling Act provides that said Constitution shall "make no distinction in civil or political rights on account of race or color," and shall provide that said state shall never enact any law restricting or abridging the right of suffrage "on account of race, color, or previous condition of servitude." Section 415, Williams' Ann. Const. Okla.; Act June 16, 1906, c. 3335, 34 St. at L., p. 269. That this suffrage amendment (section 4a, art. 3, [section 46, Williams' Ann. Const. Okla.]) to the Constitution of this state, if it does not violate the fifteenth amendment, is not void on account of said provisions of the Enabling Act, has been un-

controvertibly settled. *Coyle v. Smith,* 221 U. S. 559, 31 Sup. Ct. 688, 55 L. Ed. 853; s. c., 28 Okla. 121, 113 Pac. 944; *Atwater v. Hassett et al., supra; McCabe et al. v. A., T. & S. F. R. Co.,* 186 Fed. 966, 109 C. C. A. 110; *United States v. Sandoval* (D. C.) 198 Fed. 539; *Steeves v. Wilson* (Ariz.) 127 Pac. 717.

In addition the people of this state, by section 1 of article 2 of the Constitution (section 9, Williams' Ann. Const. Okla.), have specifically reserved the right to alter or reform said Constitution, conditioned that such change be not repugnant to the Constitution of the United States. If the Constitution of this state contains any modifications of the provisions of the Enabling Act except as to matters of federal cognizance, the provision of the Constitution controls. *Atwater v. Hassett et al., supra; Edwards v. Lesueur,* 132 Mo. 410, 33 S. W. 130, 31 L. R. A. 815; *Romine v. State of Washington et al.,* 7 Wash. 215, 34 Pac. 924; *Williams v. Hert* (C. C.) 110 Fed. 166; *State of Montana v. Rice,* 204 U. S. 291, 27 Sup. Ct. 281, 51 L. Ed. 490.

Again, it appears that the limitations and prohibitions of the Enabling Act relative to suffrage were addressed to the delegates chosen under the provision of the Enabling Act as a guide for action after they had assembled in the convention. This direction ceased to have any force or effect after the Constitution was framed and the state admitted under proclamation. By the language employed it does not appear to have been intended for such limitations to operate upon the power of the state Legislature after the erection of the state, but that after the state was erected the only limitations that existed were those contained in the federal Constitution. *McCabe et al. v. A., T. & S. F. Ry. Co, supra,* and authorities therein cited; *Coyle v. Smith, supra.* The registration of the plaintiff in error prior to the adoption of the amendment did not govern at said election. *Ex parte Show, supra.*

The judgment of the lower court is affirmed.

All the Justices concur.